UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

ILANA ROTHBEIN,

                  Plaintiff,

         -against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF EDUCATION; CARMEN
FARINA, former Chancellor of The New York
City Department of Education; KETLER
LOUISSAINT, New York City Superintendent
District 75; JEANNE BRADLEY, Principal
P94M/The Spectrum School; JULIA
MCCROSSON, Assistant Principal P94M/ The
Spectrum School, in their official and individual
capacities, RICHARD CARRANZA, Chancellor
of The New York City Department of Education,
in his official capacity only;

                  Defendants.

------------------------------------------------------------ X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  2/28/2019

18-CV-5106 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

       Plaintiff Ilana Rothbein, an occupational therapist formerly employed by the New York

City Department of Education ("DOE"), brought this action against DOE, the City of New York,

and various DOE employees and officers ("Defendants"), alleging, among other things, that

Defendants violated her civil rights under the federal and New York constitutions; conspired to

interfere with her civil rights in violation of 42 U.S.C. § 1985(3); discriminated and retaliated

against her in violation of the New York State and City Human Rights Laws; and breached and

tortiously interfered with an employment contract.  *See* Dkt. 1 (Compl.).  Defendants' motion to

dismiss Plaintiffs' claims under Fed. R. Civ. P. 12(b)(6), *see* Dkts. 24-26, is GRANTED IN

PART and DENIED IN PART.

# BACKGROUND[1]

Beginning in October 2013, Plaintiff, an openly gay woman, was employed as a licensed occupational therapist for Defendant DOE at P94M/The Spectrum School ("P94M"). *See* Dkt. 1 (Compl.) ¶¶ 27-38. In October 2017, following an internal investigation by DOE's Office of Special Investigation ("OSI") into charges that Plaintiff had falsified entries in DOE's electronic recordkeeping system for student services (the "Special Education Student Information System," or "SESIS"), Defendants terminated Plaintiff. *See id.* ¶¶ 67-91. In a nutshell, after an investigation that Plaintiff characterizes as riddled with procedural irregularities, OSI found that Plaintiff reported having provided therapy services to students on dates and times when, in fact, she was in the school cafeteria not providing the services claimed. *See id.* ¶¶ 67-91, 114-50. Plaintiff asserts that her termination was wrongful and that she was falsely accused of falsifying SESIS entries. *See id.* ¶¶ 38-66, 71, 74, 77-79, 86, 97-108.

Consistent with the collective-bargaining agreement between Plaintiff's union, the United Federation of Teachers ("UFT"), and DOE, Plaintiff appealed her termination, attending both a "Step 1" and "Step 2" hearing with her union representative and DOE representatives. Dkt. 1 (Compl.) ¶¶ 93-108. DOE denied Plaintiff's grievance at both steps, *id.,* and the union declined to pursue her grievance to arbitration, *id.* ¶¶ 109-10.

In June 2018, Plaintiff filed this action, asserting a host of claims under federal, state, and New York City laws against New York City; DOE; DOE's current and former Chancellors; P94M's district superintendent; Jeanne Bradley, P94M's principal; and Julia McCrosson, P94M's assistant principal ("AP"). *See* Dkt. 1 (Compl.) ¶¶ 6-15, 154-223. Plaintiff seeks

---

[1]      The Court draws the following factual background from the Complaint and accepts Plaintiff's factual allegations as true. *See, e.g., Gibbons v. Malone,* 703 F.3d 595, 599 (2d Cir. 2013).

reinstatement, compensatory and punitive damages, attorneys' fees, and declaratory relief. *Id.*

¶¶151-53; *id.* at 32-33. Defendants moved to dismiss. *See* Dkts. 24-26.

## DISCUSSION

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient

facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d

271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). When

considering a Rule 12(b)(6) motion to dismiss, the Court accepts all factual allegations in the

complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff.

*See Gibbons*, 703 F.3d at 599. "[T]o survive a motion under Rule 12(b)(6), a complaint does not

need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an

entitlement to relief above the speculative level." *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64,

70 (2d Cir. 2014) (citation omitted).

### I. Defendants' Request That the Court Consider Documents Beyond the Complaint

Defendants ask the Court to consider several documents they included with their motion

to dismiss. *See generally* Dkt. 26 & exs. 1-8; *see also* Dkt. 25 (Mem. in Supp. of MTD) at 3 n.3;

Dkt. 34 (Dec. 27, 2018 letter from Defendants). Plaintiff generally opposes Defendants' request,

although she acknowledges that her Complaint does "refer[] to some of the exhibits defendants

include with their motion." Dkt. 30 (Mem. in Opp. to MTD) at 2 n.1. Unhelpfully, Plaintiff

does not specify which documents, if any, she concedes the Court may properly consider. *Id.*

In resolving a motion to dismiss, a court ordinarily "must limit" its review "to facts stated

in the complaint or in documents attached to the complaint as exhibits or incorporated in the

complaint by reference." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). "A

complaint is deemed to include any written instrument attached to it as an exhibit, . . . materials

incorporated in it by reference, . . . and documents that, although not incorporated by reference,

are 'integral' to the complaint . . . ." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). A document is "integral" to the complaint only where the plaintiff "reli[ed] on the terms and effect of [the] document in drafting the complaint." *Chambers*, 282 F.3d at 153.

Apart from considering documents referenced in or integral to a complaint, a court may also consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence" and, consequently, disregard "allegations in a complaint that contradict or are inconsistent with judicially-noticed facts." *Becker v. Cephalon, Inc.*, No. 14-CV-3864, 2015 WL 5472311, at *3, 5 (S.D.N.Y. Sept. 15, 2015) (internal quotation marks omitted).

For purposes of resolving Defendants' motion to dismiss, the Court will consider the following three documents that Defendants have submitted, along with another document Defendants have not submitted but that Plaintiff relied upon in her Complaint.[2]

The Court will consider (1) the DOE OSI's June 8, 2017 Investigative Report regarding Plaintiff and (2) the DOE–UFT CBA in effect when Plaintiff was terminated. *See* Dkt. 26 exs. 3, 7. Plaintiff relied extensively on both documents, so they are "integral" to the Complaint. *Chambers*, 282 F.3d at 153; *see also* Dkt. 1 (Compl.) ¶¶ 67, 71-83, 93, 101, 107-10, 124-26, 135.

Next, the Court takes judicial notice of a petition Plaintiff filed against Defendants in New York County Supreme Court, pursuant to N.Y. C.P.L.R. section 7803, seeking (1) a judgment that Plaintiff's termination violated New York's Civil Service Law, DOE rules, and the DOE–UFT CBA, (2) damages, and (3) reinstatement. *See* Dkt. 26 ex. 8. The Court notices the

---

[2]     Plaintiff does not question the authenticity of any of these documents or assert a "material disputed issue[] of fact regarding the[ir] relevance . . . ," *Falkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Because Defendants' other documents are unnecessary to the Court's disposition of Defendants' motion, the Court will not address them.

petition, however, only for the content of its allegations.  *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (internal quotation marks omitted)); *Manta Indus., Ltd. v. TD Bank, N.A.*, No. 17-CV-2495, 2018 WL 2084167, at *6.  Similarly, the Court takes judicial notice of the Supreme Court's order disposing of Plaintiff's petition (to which Plaintiff raised no authenticity objection), but only to the extent it shows that the petition was disposed of.  *See* Dkt. 34 ex. 1.

Finally, because Plaintiff's Complaint "reli[ed] on the terms and effect of" DOE's "Rules and Regulations Governing Non-Pedagogical Administrative Employees," those rules are "integral" to the Complaint, and the Court will consider them in resolving this motion. *Chambers*, 282 F.3d at 153; *see also* Dkt. 1 (Compl.) ¶¶ 120-23.  The Rules and Regulations— which Defendants did not submit with their motion—are attached to this opinion as Appendix A.

## II. New York City's Motion to Dismiss

Defendants contend, and Plaintiff does not contest, that the City of New York is not a proper party to this action because DOE and the City of New York are separate entities, and there are no allegations specific to the City in the Complaint.  Dkt. 25 (Mem. in Supp. of MTD) at 23 n.9.  The Court agrees and dismisses all claims as against the City.  *See, e.g.*, *White v. N.Y.C.*, No. 13-CV-7156, 2014 WL 4357466, at *18-19 (S.D.N.Y. Sept. 3, 2014) (dismissing claims against New York City because it and DOE "remain distinct legal entities" and because "[p]laintiff ha[d] not alleged any facts implicating [City] in the alleged wrongdoing").  Plaintiff will be given leave to amend her Complaint to allege facts that implicate the City in the alleged wrongdoing about which she complains.

## III.    Plaintiff's Claims Under 42 U.S.C. § 1983

>   A.  Plaintiff's Section 1983 Claims are Dismissed as Against DOE and the Individual Defendants in Their Official Capacities.

It is well settled that a local government is liable under Section 1983 for injuries inflicted by its employees or agents only when the injury is "caused" by the government's policy or custom.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 693-95 (1978); *see also, e.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) ("[T]ortious conduct, to be the basis for municipal liability under § 1983, must be pursuant to a municipality's 'official policy' . . . .").  In responding to Defendants' argument that she has failed to plead an official policy or custom upon which her Section 1983 claims against DOE can be founded, *see* Dkt. 25 (Mem. in Supp. of MTD) at 15-16, Plaintiff expressly disclaimed any reliance on a *Monell*-type policy, cryptically insisting that she "does not at this stage rely upon a *Monell* claim against the City but rather on the specific acts and participation alleged on the part of defendant former Chancellor Farina as an actionable basis for [Farina's] liability," Dkt. 30 (Mem. in Opp. to MTD) at 12.  Because Plaintiff admits that her Complaint fails to plead the only theory pursuant to which DOE can be liable under Section 1983, her Section 1983 claims are dismissed as against DOE.[3]

Plaintiff's Section 1983 claims against the individual defendants in their official capacities suffers from the same legal flaw.  *Monell*'s "policy or custom" requirement applies as much to a suit against a municipal officer in his or her official capacity as it does to a suit against the municipality itself.  *See, e.g.*, *Patterson v. Cty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent. . . . Because

---

[3]     Plaintiff's contrary allegation notwithstanding, *see* Dkt. 1 (Compl.) ¶ 20, DOE cannot be liable under Section 1983 for the individual defendants' conduct on a *respondeat superior* theory.  *See Monell*, 436 U.S. at 691.

the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law." (internal quotation marks and citations omitted))), *superseded in part on other grounds by statute as recognized in Iuorno v. DuPont Pharm. Co.*, 129 F. App'x 637, 639 n.4 (2d Cir. 2005). The policy-or-custom requirement also applies "irrespective of whether the relief sought is monetary or prospective." *L.A. Cty. v. Humphries*, 562 U.S. 29, 39 (2010). Thus, having disavowed that she is pursuing a claim premised on a municipal policy or practice, Plaintiff has failed to state a Section 1983 claim against the individual defendants in their official capacities.

B.  Counts One and Two are Dismissed as Against the Individual Defendants in Their Personal Capacities.

The Court also dismisses Counts One and Two as against the individual defendants in their personal capacities. Qualified immunity shields a government official from money damages when his conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)); *see also, e.g.*, *Davis v. Scherer*, 468 U.S. 183, 197 (1984) ("A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue."). While a plaintiff need not identify "a case directly on point" to demonstrate that an asserted federal right was clearly established at the time a defendant acted, the Supreme Court has instructed time and again that "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Mullenix v. Luna*, 136 S. Ct. 305, 551 (2015) (per curiam) (emphasis added) (citation omitted); *see also, e.g.*, *Emmons*, 139 S. Ct. at 504; *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) ("The rule must be settled law, . . . which

means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." (internal quotation marks and citations omitted)); *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017) (per curiam) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, . . . but in the light of pre-existing law the unlawfulness must be apparent . . . ." (internal quotation marks omitted)). To that end, the Supreme Court has described qualified immunity as a "demanding" doctrine protecting "all but the plainly incompetent or those who knowingly violate the law."[4] *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Moreover, because qualified immunity exists in part "to ensure that insubstantial claims against government officials will be resolved prior to discovery," the Supreme Court has called on courts to "resolv[e] immunity questions at the earliest possible stage in litigation," including on a motion to dismiss. *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (internal quotation marks, citations, and alterations omitted). To that end, a district court has discretion to decide which of the two prongs of the qualified immunity analysis—whether the plaintiff has alleged a constitutional violation and, if so, whether, at the time of the alleged violation, the right at issue was clearly established—should be addressed first. *Id.* at 232, 236.

Heeding the Supreme Court's admonition to "think hard, and then think hard again," before addressing both qualified-immunity prongs, *Camreta v. Greene*, 563 U.S. 692, 707 (2011), the Court elects to consider the "clearly established" prong only. On that basis alone, the

---

[4] In light of these principles, Plaintiff's vague assertion that "the constitutional rights involved here were clearly established, and were well-known to any reasonable public official prior to plaintiff's unlawful termination," Dkt. 30 (Mem. in Opp. to MTD) at 13, is inadequate. *See Pauly*, 137 S. Ct. at 552 ("[I]t is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality. . . . As this Court explained decades ago, the clearly established law must be particularized to the facts of the case. . . . Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." (internal quotation marks and alterations omitted)).

individual defendants are entitled to qualified immunity from damages for Counts One and Two. Both counts allege the deprivation of a constitutionally protected interest without due process: Count One asserts a deprivation of Plaintiff's purported property interest in continued public employment, and Count Two asserts a deprivation of her purported liberty interest in "her good name and reputation." Dkt. 1 (Compl.) ¶¶ 154-72. Even assuming that Plaintiff has the due-process-protected property and liberty interests she describes (questions on which the Court need not and does not express any opinion), Plaintiff has failed to offer—and the Court has been unable to find—any authority that would have placed the purported unlawfulness of the individual defendants' pre-termination conduct "beyond debate," *Emmons*, 139 S. Ct. at 504 (quoting *Wesby*, 138 S. Ct. at 581); *see also, e.g.*, *Wesby*, 138 S. Ct. at 590 ("The rule must be settled law, . . . which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." (internal quotation marks and citations omitted)).

To the contrary, the pertinent case law appears to *bless* the pre-termination process Plaintiff received as having satisfied constitutional requirements. Both the Supreme Court and the Second Circuit have described the Fourteenth Amendment's Due Process Clause as requiring only that a "tenured public employee" receive "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" before termination. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *see also Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 321 (2d Cir. 2002) ("We hold, therefore, that the process due [the employee] was notice of the charges against him and the opportunity to be heard before demotion.").

Plaintiff alleges that (1) on April 28, 2018, OSI provided Plaintiff with notice that she was the subject of a confidential investigation, *see* Dkt. 1 (Compl.) ¶ 72; (2) on May 12, 2017, an OSI investigator interviewed Plaintiff, who provided her version of the pertinent events, *id.*

¶¶ 72-73; (3) Plaintiff was provided with a copy of OSI's resulting report on September 8, 2017, *id.* ¶ 82; and (4) Plaintiff and a union representative attended a September 28, 2017 "Due Consideration" meeting with a DOE lawyer, during which Plaintiff was again given an opportunity to explain her version of the facts, *id.* ¶¶ 84, 87.  To the extent these procedures were insufficiently rigorous, it is hardly "beyond debate," *Emmons*, 139 S. Ct. at 504, that they failed to satisfy the Fourteenth Amendment's requirement of "oral or written notice of the charges . . . , an explanation of the employer's evidence, and an opportunity to present [one]'s side of the story," *Loudermill*, 470 U.S. at 546.  Any right to further process—including any right to "legal counsel" or to "presentation or cross examination of witnesses," as Plaintiff suggests, *see* Dkt. 1 (Compl.) ¶¶ 158—was not clearly established at the time the individual defendants acted.

Plaintiff's Complaint and briefing suggest a variety of other ways in which the pre-termination process afforded her was constitutionally insufficient, but most of those allegations are conclusory and thus to be disregarded.[5]  The allegations that are not conclusory are legally inadequate because any federal right Plaintiff might have had to be free from the procedural fouls she alleges was not clearly established in 2017.  For example, Plaintiff contends that she was not dismissed in accordance with procedures laid out in the DOE–UFT CBA and DOE guidelines or regulations.  *See* Dkt. 30 (Mem. in Opp. to MTD) at 3-4.  Although possibly relevant to her contractual claims, those allegations are irrelevant to her constitutional claims: to the extent the Fourteenth Amendment required compliance with those procedures (a proposition

---

[5]    *See* Dkt. 1 (Compl.) ¶ 140 ("The investigation itself lacked due process."); *id.* ¶ 141 ("To the extent the investigation was based on vague and unspecific allegations, these allegations were not substantiated."); *id.* ¶ 143 ("The termination was based on an unprofessional and flawed OSI investigation/OSI report and input from alleged 'witnesses' and biased administrators who were not actual witnesses to the events alleged."); *id.* ¶ 156 ("Defendant DOE terminated Plaintiff's employment as an occupational therapist without adequate notice or opportunity to be heard."); *id.* ¶ 159 ("Defendant DOE has refused to provide evidence on which its termination decision was allegedly based."); *see also, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (internal quotation marks omitted)).

of which the Court is highly skeptical), any *constitutional* right to such compliance was not clearly established when Plaintiff was fired.

It was also not clearly established in 2017 that Plaintiff had any right to the disclosure of the entirety of the video recording on which OSI relied as evidence that Plaintiff had falsified reports regarding her provision of therapy services. The Complaint alleges that Plaintiff's termination "was based on alleged video evidence" but that "[d]espite plaintiff's numerous requests, including requests filed under the New York Freedom of Information Law, plaintiff has not been provided a copy of the video in its entirety." Dkt. 1 (Compl.) ¶¶ 79, 144. The OSI report described this video footage as having shown plaintiff "sitting in the cafeteria" between "approximately 8:00am to 9:00am" on February 6 and 7, 2017, without ever interacting with the students that Plaintiff reported as having received therapy from Plaintiff on those days and those times. Dkt. 26 ex. 3 (OSI report) at 4. Although it is unclear why the entirety of the allegedly incriminating video footage was not produced, the individual defendants are nevertheless qualifiedly immune from any claim that failing to provide the entire tape violated Plaintiff's right to due process. The pertinent case law is at best ambiguous: the Fourteenth Amendment requires a public employer to provide "an *explanation* of the employer's evidence," *Loudermill*, 470 U.S. at 546 (emphasis added)—an obligation that Defendants could reasonably have believed was satisfied by the production of the OSI report. The case law on which Plaintiff relies does not, "beyond debate," *Emmons*, 139 S. Ct. at 504 (quoting *Wesby*, 138 S. Ct. at 581), obligate a public employer to produce to a to-be-terminated employee all of its raw evidence.[6] To deny

---

[6]     Plaintiffs' cases are, in fact, entirely inapposite. *See* Dkt. 30 (Mem. in Opp. to MTD) at 5-7 & n.2 (citing *Ciambriello*, 292 F.3d at 323 (holding only that because the Fourteenth Amendment entitled a public employee to pre-demotion process, he was entitled to "more due process" than the exclusively post-termination process laid out in CBA); *Newtown v. N.Y.C.*, 738 F. Supp. 2d 397, 414 (S.D.N.Y. 2010) (describing a government's general obligation to ensure that its procedures comport with due process); *Briecke v. New York*, 936 F. Supp. 78, 82 (E.D.N.Y. 1996) (describing prosecutor's obligation to disclose exculpatory evidence in criminal proceeding under *Brady v. Maryland*, 373 U.S. 83, 87 (1963)); *Burka v. N.Y.C. Transit Auth.*, 739 F. Supp. 814, 843 n.23 (S.D.N.Y.

qualified immunity despite the case law's ambiguity would contravene the Supreme Court's repeated admonition that "the clearly established law must be 'particularized' to the facts of the case." *Pauly*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).[7]

Claims One and Two are therefore dismissed against the individual defendants in their personal capacities.[8]

C. Count Three States a Claim Against the Individual Defendants in Their Personal Capacities, and the Court Cannot Hold That They are Entitled to Qualified Immunity at This Stage.

Count Three asserts a Fourteenth Amendment substantive-due-process claim. Defendants' motion to dismiss Count Three as against the individual defendants in their personal capacities is denied. The guarantee of substantive due process "is an outer limit on the legitimacy of governmental action," *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999), that protects the individual against the arbitrary and oppressive exercise of government

---

1990) (suggesting that Transit Authority's use of preponderance standard in adjudicating marijuana-use charges against employees *may* violate due process if employees lack "adequate means . . . to gain access to evidence to support [their] defense")).

[7]      In her briefing, Plaintiff suggests that "Defendants' failure to provide a name-clearing hearing is yet another process violation, as the 'problem code' classification may prevent plaintiff from renewing her license, effectively leading to the suspension of her license." Dkt. 30 (Mem. in Opp. to MTD) at 8. If Plaintiff means to suggest that any of her claims are premised on a denial of adequate *post*-termination due process, any such theory is absent from her Complaint. Plaintiff may not prop up Counts One and Two, which are based on allegedly inadequate *pre*-termination process, with unpleaded criticisms of Defendants' *post*-termination process.

In a similar vein, because the Court dismisses Counts One and Two in their entirety, it need not address Defendants' argument that Plaintiff was provided adequate post-termination process. *See* Dkt. 25 (Mem. in Supp. of MTD) at 11-12.

[8]      Although qualified immunity shields a defendant from damages liability only, *see, e.g.*, *Davis*, 468 U.S. at 197, to the extent that Counts One and Two (and Counts Three and Four, for that matter) seek injunctive or declaratory relief against the individual defendants in their personal capacities, those claims must nevertheless be dismissed: such relief "can be obtained only from the defendants in their official capacities, not as private individuals." *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989); *see also, e.g.*, *Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 19-26 (D.D.C. 2007) ("Despite [plaintiff's] attempt to obtain injunctive relief from the individual defendants for the deprivation of his liberty interests . . . , he simply cannot seek that redress from the individual defendants in their personal capacities. Rather, the relief [plaintiff] seeks can only be provided by the government through government employees acting in their official capacities because deprivation of a constitutional right can only be remedied by the government."); *Cuyuga Nation v. Zinke*, 302 F. Supp. 3d 352, 358-60 (D.D.C. 2018) (citing *Hatfill* and dismissing personal-capacity claims for injunctive and declaratory relief).

authority, *see Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). The Supreme Court has emphasized "that only the most egregious official conduct can be said to be arbitrary in the constitutional sense" and that "the cognizable level of executive abuse of power [is] that which shocks the conscience." *Lewis*, 523 U.S. at 846 (internal quotation marks omitted). Put differently, "[s]ubstantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is [merely] incorrect or ill advised." *Cunney v. Bd. of Trs.*, 660 F.3d 612, 626 (2d Cir. 2011) (internal quotation marks omitted). "Nevertheless, malicious and sadistic abuses of power by government officials, intended to oppress or to cause injury and designed for no legitimate government purpose, unquestionably shock the conscience." *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) (internal quotation marks omitted). "This is so because our constitutional notion of due process rests on the bedrock principle that we must protect the individual against the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.* (internal quotation marks and alteration omitted).

Plaintiff has barely—just barely—pleaded a plausible substantive-due-process claim. Count Three alleges that defendants "violated plaintiff's right to substantive due process by falsely accusing her of failing to provide services to her students and falsifying her entries on SESIS." Dkt. 1 (Compl.) ¶¶ 174-75. Plaintiff's Complaint elsewhere alleges that she "had no disciplinary issues or work issues" at P94M until Defendant McCrosson began working as an assistant principal there, *id.* ¶ 40; that McCrosson "falsely accused plaintiff of not being with a student during a [therapy] session and falsely accused plaintiff of not sending her schedule to teachers," *id.* ¶ 42; that Plaintiff reported McCrosson's allegedly false accusations to Defendant Bradley, McCrosson's boss, during a "confidential" meeting and told Bradley that she believed McCrosson was discriminating against her because of her sexual orientation, *id.* ¶¶ 45-48; and

that Bradley nonetheless launched an internal investigation into Plaintiff, justifying the investigation on a false accusation similar to those that McCrosson had made: namely, that Plaintiff had falsely reported providing student services she had not actually provided, *see id.* ¶ 67.  Plaintiff also alleges that she believed her entries into the SESIS record regarding her activities in the school cafeteria on February 6 and 7, 2017 were wholly appropriate and accurate, *see id.* ¶ 54-66; that on October 6, 2017, two days after her termination from P94M, former coworkers told Plaintiff that Bradley was instructing P94M staff not to communicate with Plaintiff because "she did not leave peacefully," a false allegation, *id.* ¶ 92; and that a P94M paraprofessional—presumably a former coworker of Plaintiff's—told Plaintiff that Defendant McCrosson disliked Plaintiff, *id.* ¶ 102.  Taking these specific factual allegations as true and drawing all inferences in Plaintiff's favor, Plaintiff's complaint barely raises a fair inference that Defendants waged a campaign to deprive her of her job by intentionally and maliciously fabricating and disseminating falsehoods, *Velez*, 401 F.3d at 94—precisely the kind of "malicious and sadistic abuse[] of power by government officials, intended to oppress or to cause injury and designed for no legitimate government purpose," that "unquestionably shock[s] the conscience," *id.* (internal quotation marks omitted).  On that theory—and on that theory alone— Count Three states a claim against the individual defendants in their personal capacities for a deprivation of substantive due process.

The Complaint is adequate notwithstanding Defendants' argument that Plaintiff's termination was justified by OSI's investigative conclusion that Plaintiff falsely claimed providing therapy services to certain students when, in fact, she did not.  Dkt. 25 (Mem. in Supp. of MTD) at 12-13; *see also* Dkt. 33 (Reply in Supp. of MTD) at 4-5.  On a full factual record, evidence that Plaintiff did, in fact, falsify SESIS reports will likely be fatal to this claim as it would tend to prove that Defendants' termination decision was reasonably justified in the service

of a legitimate governmental objective. *Velez*, 401 F.3d at 94. At this stage of the litigation, however, the Court must credit Plaintiff's specific, factual allegation that Defendants' accusations against her were false and unfounded, *see Gibbons*, 703 F.3d at 599—in which case her theory that the individual defendants worked maliciously to fire her because of personal animus becomes sufficiently plausible to survive a motion to dismiss.

To clarify the course of future litigation, however, the Court notes three theories on which Plaintiff may *not* premise her substantive-due-process claim. First, the Court rejects Plaintiff's repeated contention that her firing "shocked the conscience" for substantive-due-process purposes because the alleged misconduct at issue was "significantly less extreme conduct than misconduct engaged in by other DOE employees who received far less punitive discipline." Dkt. 30 (Mem. in Opp. to MTD) at 9-10. The Supreme Court and the Second Circuit have made clear that "where another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of substantive due process.'" *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also, e.g.*, *Velez*, 401 F.3d at 94. To the extent Plaintiff premises her substantive-due-process claim on the theory that she was treated differently from similarly situated coworkers without any rational purpose, her claim is properly viewed as a "class of one" claim arising under the Fourteenth Amendment's Equal Protection Clause—a claim the Supreme Court has held "has no place in the public employment context," *Enquist v. Or. Dep't of Agric.*, 553 U.S. 591, 594 (2008).

Similarly, Plaintiff's substantive due process claim is not supported by her observation that "[s]tate courts have found terminations from public employment based on conduct more egregious than plaintiff's to be arbitrary and capricious" under state law. Dkt. 30 (Mem. in Opp.

to MTD) at 11. Even if Plaintiff is correct, that is irrelevant: "[s]ubstantive due process . . . does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action," *Natale*, 170 F.3d at 263. Finally, Plaintiff cannot base Count Three on her contention that her termination was "tainted with fundamental procedural irregularity," Dkt. 30 (Mem. in Opp. to MTD) at 10 (internal quotation marks omitted). Although evidence that Defendants departed from their written procedures *may* be relevant to prove that they terminated Plaintiff out of malice rather than for any legitimate government purpose, if what Plaintiff is claiming is shocking about Defendants' conduct is that Defendants deprived her of liberty or property without due process, then Plaintiff's *substantive*-due-process claim is actually a *procedural*-due-process claim. It would then be subsumed into Counts One and Two, *Velez*, 401 F.3d at 94, as to which the individual defendants are qualifiedly immune.[9]

The individual defendants are not, however, qualifiedly immune from the barely plausible portion of Plaintiff's substantive-due-process claim. To the extent the individual defendants "require[d] a case directly on point" to know that their alleged conduct was unconstitutional, *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted), the Second Circuit has made clear that public officials may not "intentionally and maliciously fabricate[] and

---

[9] To avoid any misunderstanding, the alleged personal animus underlying the surviving substantive-due-process claim *cannot* be discriminatory animus based on sexual orientation, gender, or some other protected characteristic but must rather be animus driven by sheer personal dislike for Plaintiff *not* on account of her membership of a protected class. This is because (1) *Conn* and *Velez* require this Court to treat a substantive-due-process claim premised on a violation of a more specific constitutional provision as a claim under that more specific provision, (2) a claim alleging discrimination on account of sexual orientation or gender necessarily arises under the Equal Protection Clause and must be treated as a claim under that clause, and (3) any claim that Defendants "treated [Plaintiff] differently from others" but *not* on account of her membership of a protected class also arises under the Equal Protection Clause and must be treated as an Equal Protection "class of one claim"—a claim unavailable in the public-employment context, *Engquist*, 553 U.S. at 606. Thus, for Plaintiff's substantive-due-process claim to survive, it (1) must be based on animus against Plaintiff rooted in something other than her membership of a protected class, and (2) it may *not* be based on allegations that Defendants treated Plaintiff differently from other employees, *Velez*, 401 F.3d at 94.

disseminate[] falsehoods in a common effort to deprive [a public employee] of her job" with "no legitimate purpose," *Velez*, 401 F.3d at 94. Because Count Three alleges just that sort of malicious and oppressive vendetta, the individual defendants are not qualifiedly immune from damages for that claim. *See, e.g.*, *Mullenix*, 136 S. Ct. at 308 ("[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (internal quotation marks omitted)). Defendants may reassert qualified immunity at later phases of the litigation if supported by the facts.

### D.  Leave to Amend Counts One, Two, and Three

The Court will grant Plaintiff leave to amend Counts One, Two, and Three (1) to state claims against the municipal defendants and the individual defendants in their official capacities and (2) with respect to Counts One and Two, to state claims against the individual defendants in their personal capacities from which they are not qualifiedly immune. Given Plaintiff's disclaimer of any *Monell*-type policy or procedure (*see supra* Pt. III(A)) and the state of the case law bearing on the individual defendants' immunity from suit (*see supra* Pt. III(B)), the Court is skeptical that further amendment of these claims would be beneficial. But because leave to amend should be given "freely," Fed. R. Civ. P. 15(a)(2), the Court will grant it here.

## IV.  Plaintiff's Section 1985(3) Claim

The Court grants Defendants' motion to dismiss Count Four, which asserts a claim under 42 U.S.C. § 1985(3) for conspiracy to deprive Plaintiff of her Fourteenth Amendment right to equal protection. To plead such a claim, Plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is deprived of any right of a citizen of the United States." *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 2000) (internal quotation marks and alterations omitted), *abrogated in part on other*

*grounds by Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002). With respect to the first and second elements, Plaintiff "must [plead] some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (internal quotation marks omitted). Plaintiff has not alleged except in the most conclusory fashion that there was a meeting of the minds among the Defendants to act against her with the *specific purpose* of depriving her of her right to equal protection. *Id*. This alone requires that the claim be dismissed.[10]

Moreover, Plaintiff's opposition to Defendants' motion to dismiss all but abandons her Section 1985(3) claim. In opposing the motion, Plaintiff indicated that she is prepared to dismiss this claim unless the Court determines that UFT is a necessary party, Dkt. 30 (Mem. in Opp. to MTD) at 21 n.9, an apparent reference to Defendants' contention that Plaintiff's contract claims must be dismissed for failure to name a necessary party, *see* Dkt. 30 (Mem. in Supp. of MTD) at 22-23. The Court will take Plaintiff up on her offer. Because the Court concludes that UFT is not a necessary party, *see infra* Pt. IX(c), the Court treats Count Four as abandoned and accordingly dismisses it. And because Plaintiff did not amend her Complaint to shore up a claim that she now concedes is deficient, *see* Fed. R. Civ. P. 15(a)(1)(B), and because Plaintiff's briefing suggests that Count Four is viable only if a non-party is joined to this litigation (which joinder she herself opposes, *see* Dkt. 30 (Mem. in Opp. to MTD) at 20-21, and which the Court denies), amending Count Four would be futile. Leave to amend is, therefore, denied.

---

[10] Because the Court dismisses this claim with prejudice on another ground, it need not resolve whether the claim is also barred by the so-called "intra-corporate conspiracy doctrine," as Defendants contend. *See* Dkt. 25 (Mem. in Supp. of MTD) at 13-15.

## V. Plaintiff's Claim Under the New York City Human Rights Law

NYCHRL claims must be analyzed "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109-10 (2d Cir. 2013) (citations omitted).[11]

### A. NYCHRL Claim for Discrimination

Defendants' motion to dismiss Count Five is granted to the extent it is premised on sexual-orientation discrimination. To prove a claim for such discrimination under the NYCHRL, a "plaintiff need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her [sexual orientation]." *Mihalik*, 715 F.3d at 109-10 (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (N.Y. App. Div. 2009)); *see also, e.g., Raji v. Societe Generale Americas Sec. LLC*, No. 15-CV-1144, 2018 WL 1363760, at *4 (S.D.N.Y. Feb. 28, 2018) (applying *Williams* standard to NYCHRL claims alleging sexual-orientation discrimination). The Second Circuit has warned district courts, however, to "be mindful that the NYCHRL is not a general civility code" and that the "plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Mihalik*, 715 F.3d at 110 (internal quotation marks omitted). A plaintiff can raise an inference of a discriminatory motive in a number of ways, including by pleading direct evidence of discrimination—a comment indicating prejudice on account of a protected characteristic, for example, *see Raji*, 2018 WL 1363760, at *5 —or by pleading specific facts suggesting that other, similarly situated employees outside of the plaintiff's protected class were treated better than the plaintiff, *see, e.g.,*

---

[11]     Both sides acknowledge that Plaintiff's NYCHRL and NYSHRL claims are governed by different standards and must be evaluated separately, *see* Dkt. 25 (Mem. in Supp. of MTD) at 17; Dkt. 30 (Mem. in Opp. to MTD) at 14, yet neither side's briefing evaluated the claims separately, and both indiscriminately and inexplicably applied Title VII case law to both claims. Going forward, the parties *must* evaluate Plaintiff's claims separately—as they ask this Court to do—and *must* cite authorities specific to each type of claim (or, at the very least, identify for the Court the type of claim to which each cited authority relates).

*LeBlanc v. United Parcel Serv.*, No. 11-CV-6983, 2014 WL 1407706, at *15-16 (S.D.N.Y. Apr. 11, 2014).[12]

The Complaint fails to raise a plausible inference of discriminatory motive on account of Plaintiff's sexual orientation. The Complaint is entirely devoid of any facts directly evidencing a discriminatory motive on the part of any Defendant—a homophobic slur, for instance, or any other remark or conduct relating to Plaintiff's sexuality.[13] *See, e.g., Raji*, 2018 WL 1363760, at *5 (holding that plaintiff had raised triable issue of fact relative to defendant's discriminatory motive where evidence showed that defendant had used anti-French slurs and directly asked plaintiff if he was gay). Plaintiff implicitly acknowledges as much, contending that she has stated a plausible discrimination claim under the NYCHRL (and the NYSHRL, for that matter) not because she has pleaded any direct evidence of discriminatory motive but because she has alleged the existence of a similarly situated DOE therapist who was not openly gay and who was not investigated or terminated for falsifying SESIS entries. *See* Dkt. 30 (Mem. in Opp. to MTD) at 13-14; *see also* Dkt. 1 (Compl.) ¶ 66 ("Upon information and belief, at least one other

---

[12]     Count Five alleges in a conclusory fashion that Defendants "created a hostile work environment for plaintiff due to her sexual orientation" in violation of the NYCHRL. Dkt. 1 (Compl.) ¶¶ 194-95. Under the NYCHRL, however, unlike under Title VII and the NYSHRL, there is no distinction between a claim premised on the creation of a hostile work environment (a species of harassment claim) and one premised on unlawful discrimination: the former is subsumed into the latter, and a plaintiff need only prove that "she has been treated less well than other employees because of a protected trait," *Johnson v. Strive E. Harlem Emp't Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also, e.g., Clarke v. InterContinental Hotels Grp.*, No. 12-CV-2671, 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) ("Under the NYCHRL, there are not separate standards for 'discrimination' and 'harassment' claims."); *Sotomayor v. N.Y.C.*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) (citing *Williams*, 872 N.Y.S.2d at 37) ("Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims.").

[13]     Paragraph 41 of the Complaint does allege that McCrosson "subjected [P]laintiff to unfounded allegations, harassment, and disparate and discriminatory treatment because of her sexual orientation." Dkt. 1 (Compl.) ¶ 41. This is nothing more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" which this Court cannot credit as true. *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

therapist made SESIS entries which were demonstrably factually incorrect, such as recording being in the cafeteria when she was not[,] and was not penalized or disciplined.").[14]

But Plaintiff's disparate-treatment theory is not plausible as pleaded. To raise an inference of discriminatory motive based on Defendants' more favorable treatment of a comparator, Plaintiff must plead facts showing that the comparator was "similarly situated in all material respects"—that is, "subject to the same workplace standards" as Plaintiff and accused of conduct of "comparable seriousness" to that of which Plaintiff was accused. *LeBlanc*, 2014 WL 1407706, at *15 (citation omitted). The Complaint fails on this score. None of its three references to the alleged comparator even attempts to allege that the comparator was similarly situated to Plaintiff in any, let alone all, material respects.[15] The most factually detailed of these references—the allegation that "another therapist known to AP McCrosson made factually false SESIS entries on February 7, 2017, indicating that she was providing a speech session in the cafeteria when she was in fact outside doing bussing, yet she was neither reported nor investigated, much less terminated"—is alleged only "[u]pon information and belief," *id.* ¶ 147. The Second Circuit has instructed that, post-*Twombly*, a plaintiff may plead facts "upon information and belief" only "where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). Plaintiff

---

[14]     Count Five also lists specific "acts of discrimination" on which Plaintiff's NYCHRL claim is based. *See* Dkt. 1 (Compl.) ¶ 196. All but one—a conclusory allegation that Defendants subjected Plaintiff to a hostile work environment—allege disparate treatment rather than direct evidence of discriminatory motive.

[15]     *See* Dkt. 1 (Compl.) ¶ 48 ("At the meeting, Plaintiff compared AP McCrosson's treatment of her with McCrosson's more favorable treatment of another therapist who was not gay."); *id.* ¶ 66 ("Upon information and belief, at least one other therapist made SESIS entries which were demonstrably factually incorrect, such as recording being in the cafeteria when she was not[,] and was not penalized or disciplined."); *id.* ¶ 147 ("Upon information and belief, another therapist known to AP McCrosson made factually false SESIS entries on February 7, 2017, indicating that she was providing a speech session in the cafeteria when she was in fact outside doing bussing, yet she was neither reported nor investigated, much less terminated.").

fulfills neither requirement; she fails to explain why information concerning this alleged

comparator is "peculiarly within [Defendants'] possession and control," and she fails to allege

other facts to support her assertion that this comparator exists and was treated more favorably

than Plaintiff for roughly the same misconduct. *Id.* The Court therefore "has no basis from

which to infer that Plaintiff['s] belief" regarding the comparator is anything more "than pure

speculation." *Ludwig's Drug Store, Inc. v. Forest City Enters., Inc.*, No. 13-CV-6045, 2016 WL

915102, at *14 (E.D.N.Y. Mar. 4, 2016).

Therefore, Count Five is dismissed to the extent it asserts a claim for discrimination

under the NYCHRL. Leave to amend, however, is granted.[16]

## B. NYCHRL Claim for Retaliation

Defendants' motion to dismiss Count Five is denied to the extent it asserts a claim of

unlawful retaliation under the NYCHRL. To plead such a claim, Plaintiff "must show that she

took an action opposing her employer's discrimination . . . and that, as a result, the employer

engaged in conduct that was reasonably likely to deter a person from engaging in such action."

*Mihalik*, 715 F.3d at 112 (citations omitted). Plaintiff has plausibly pleaded these elements.

Plaintiff alleges that on January 9, 2017, she and her union representative met with Bradley,

P94M's principal and McCrosson's superior, to "report[] . . . that AP McCrosson was harassing

her with unfounded allegations and engaging in discriminatory and disparate treatment." Dkt. 1

(Compl.) ¶ 47. At the meeting, Plaintiff "compared AP McCrosson's treatment of her with

---

[16] Because the Court grants Plaintiff leave to amend Count Five, the Court takes this occasion to reject Defendants' assertion that the Complaint "does not allege sufficient facts to establish that defendants were aware of plaintiff's sexual orientation." Dkt. 33 (Reply in Supp. of MTD) at 5-6; *see also* Dkt. 25 (Mem. in Supp. of MTD) at 18 (same). The Complaint alleges that Plaintiff "was the only openly gay employee at P94M/The Spectrum School" and that "Defendants knew that plaintiff is gay." Dkt. 1 (Compl.) ¶¶ 38, 185. While Plaintiff's likelihood of recovering on her discrimination claim is remote without more specific evidence that Defendants were aware of her sexual orientation, drawing all inferences in Plaintiff's favor, it is fair to infer at this stage that because Plaintiff was open about her sexuality, Defendants were aware of it.

McCrosson's more favorable treatment of another therapist who was not gay." *Id.* ¶ 48. Taking these allegations as true and drawing all inferences in Plaintiff's favor, these averments allege that Plaintiff complained to Bradley about treatment by McCrosson that Plaintiff believed—correctly or incorrectly—was discriminatory on the basis of Plaintiff's sexual orientation. This is adequate to allege "action opposing her employer's discrimination."[17] *Mihalik*, 715 F.3d at 112.

Plaintiff has also plausibly pleaded that she was subjected to adverse actions as a result of her complaint to Bradley. About a month after Plaintiff complained to Bradley, Bradley allegedly initiated an OSI investigation against Plaintiff. *See* Dkt. 1 (Compl.) ¶ 67. This sequence is sufficient to raise an inference that Defendants acted against Plaintiff "as a result" of her "opposing her employer's discrimination." *Mihalik*, 715 F.3d at 112; *see also, e.g.*, *Albunio v. N.Y.C.*, 947 N.E.2d 135, 137-38 (N.Y. 2011) (holding evidence sufficient to support jury's finding of NYCHRL retaliation where plaintiff "filed a discrimination complaint," the defendant "knew of the complaint," and sometime "after the complaint was filed, [plaintiff] was subjected to a series of adverse employment actions").

The Court is not persuaded by Defendants' contention that Count Five fails to state a retaliation claim because Bradley triggered the OSI investigation by accusing Plaintiff of the same type of misbehavior that McCrosson had accused her of before Plaintiff's discrimination

---

[17] Defendants contend that Plaintiff's meeting with Bradley cannot qualify as "opposition" because the Complaint "does not allege that plaintiff actually mentioned [the comparator] therapist's sexual orientation (or her own for that matter), nor does it allege that she mentioned her sexual orientation as the perceived basis for [McCrosson's] alleged difference in treatment." Dkt. 33 (Reply in Supp. of MTD) at 7; *see also* Dkt. 25 (Mem. in Supp. of MTD) at 19-20 (asserting same argument). This argument "slic[es] the baloney mighty thin." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1215 (2018). While it is true that Plaintiff does not *expressly* allege that she told Bradley that she believed McCrosson's perceived maltreatment of her was linked to Plaintiff's sexual orientation, Plaintiff does allege that at her meeting with Bradley, she "compared AP McCrosson's treatment of her with McCrosson's more favorable treatment of another therapist who was not gay." Dkt. 1 (Compl.) ¶ 48. While the particulars of who said what to whom will be necessary to survive a motion for summary judgment (let alone to prevail at trial), drawing all inferences in Plaintiff's favor, it is fair to interpret this allegation to mean that Plaintiff identified herself as gay and compared herself to another therapist who was not gay and, in Plaintiff's view, was treated more favorably because of it. (As noted, however, *see supra* Pt. V(A), this allegation does not plausibly demonstrate that this purported comparator was similarly situated to Plaintiff in all material respects.)

complaint. *See* Dkt. 25 (Mem. in Supp. of MTD) at 20; Dkt. 33 (Reply in Supp. of MTD) at 7.

Although judgment as a matter of law may be appropriate where a defendant began a continuous

course of conduct adverse to the plaintiff before the plaintiff engaged in protected activity, *see,*

*e.g.*, *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 42 (N.Y. App. Div. 2012), here Plaintiff

alleges that Defendants' treatment of her changed in both kind and severity after she complained

of perceived discrimination: before she complained, McCrosson had informally reprimanded her

for supposedly "not being with a student during a session," *see* Dkt. 1 (Compl.) ¶ 42; in contrast,

after she complained, Bradley initiated a formal OSI investigation of Plaintiff, *see id.* ¶ 67. The

difference between an informal reprimand and becoming the target of an internal disciplinary

investigation is significant and would likely have the effect of dissuading a reasonable employee

from complaining about perceived discrimination. Thus, the Court rejects Defendants'

"continuous course of conduct" theory at this stage.

Therefore, Defendants' motion to dismiss Count Five is denied to the extent it asserts a

claim for retaliation in violation of the NYCHRL.

## VI. Plaintiff's Claim Under the New York State Human Rights Law

### A. NYSHRL Claim for Discrimination

Plaintiff's NYSHRL discrimination claim is analyzed under the Title VII framework

established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). *See Brown v.*

*City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). Because this framework is more demanding

of a plaintiff than the NYCHRL's, Defendants' motion to dismiss Plaintiff's NYSHRL

discrimination claim is granted for the same reasons it was granted as to Plaintiff's NYCHRL

discrimination claim. *See, e.g.*, *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir.

2009) ("[C]laims under the City HRL must be reviewed independently from and more liberally

than their federal and state counterparts." (internal quotation marks omitted)); *cf., e.g.*, *Clarke*,

2013 WL 2358596, at *11 n.13 (observing that "federal civil rights laws are a floor below which the [NYCHRL] cannot fall").  Count Six is therefore dismissed to the extent it asserts an NYSHRL discrimination claim.  Leave to amend, however, is granted.

B.  NYSHRL Claim for Retaliation

Plaintiff's claim for NYSHRL retaliation is also analyzed under the Title VII framework. *See, e.g.*, *Christiansen v. Omnicom Grp.*, 167 F. Supp. 3d 598, 617 (S.D.N.Y. 2016), *rev'd in part on other grounds*, 852 F.3d 195 (2d Cir. 2017).  For this claim to survive a motion to dismiss, Plaintiff "must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against [her] (2) 'because' [s]he has opposed any unlawful employment practice."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015).  For the same reasons it denied Defendants' motion to dismiss Plaintiff's NYCHRL retaliation claim, the Court also denies their motion to dismiss her NYSHRL retaliation claim.  Count Six is plausible to the extent it asserts an NYSHRL retaliation claim.[18]

VII.  **Plaintiff's Claim Under the New York State Constitution**

Defendants' motion to dismiss Count Seven is denied.  Count Seven asserts a claim for violations of Plaintiff's rights to due process and to equal protection of the laws under Sections 6 and 11, respectively, of Article I of the New York State Constitution.  *See* N.Y. Const. art. I, § 6 ("No person shall be deprived of life, liberty or property without due process of law."); *id.* § 11. ("No person shall be denied the equal protection of the laws of this state or any subdivision thereof.").  Although Defendants style their motion as one to dismiss the Complaint in its

---

[18]    Defendants have *not* argued that Plaintiff has failed to plead facts showing "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"—that is, "that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 360 (2013).  Because the Court will not do Defendants work for them, the Court expresses no opinion on whether Plaintiff has adequately alleged but-for causation, as Title VII, and therefore the NYSHRL, require.  Defendants may raise the argument at later phases of the litigation if warranted by the facts.

entirely, their briefing in support of the motion entirely fails to address Count Seven, let alone to offer any authority supporting its motion to dismiss. Because "[j]udges are not like pigs, hunting for truffles buried in briefs," *United States v. Dunkel*, 927 F.3d 955, 956 (7th Cir. 1991), the Court will not dismiss Count Seven.

## VIII. Plaintiff's Claim for Retaliation in Violation of New York Civil Service Law Section 75-b

Defendants' motion to dismiss Count Eight, which asserts a claim under Section 75-b(2)(a) of the New York Civil Service Law for unlawful retaliation by a public employer against an employee, is granted. Pursuant to the Civil Service Law, "[w]here an employee is subject to a collective bargaining agreement requiring mandatory arbitration, the employee's Section 75-b(2)(a) claim must be asserted at the arbitration," *Verdi v. N.Y.C.*, 306 F. Supp. 3d 532, 549-50 (S.D.N.Y. 2018) (internal quotation marks omitted), and the employee is barred from "fil[ing] suit in federal court to enforce [her] rights under § 75-b," *Healy v. N.Y.C. Dep't of Sanitation*, No. 04-CV-7344, 2006 WL 3457702, at *5-7 (S.D.N.Y. Nov. 22, 2006); *see also, e.g.*, *Munafo v. Metro. Transp. Auth.*, Nos. 98-CV-4572, 00-CV-0134, 2003 WL 21799913, at *31 (E.D.N.Y. Jan. 22, 2003) ("An employee may bring suit under § 75-b in a court of competent jurisdiction only where a collective bargaining agreement does not substitute its own grievance procedure for the relief encapsulated by the statute.").

Here, Plaintiff alleges that she was an employee "subject to a collectively negotiated agreement" containing both (1) "provisions preventing an employer from taking adverse personnel actions" and (2) "a final and binding arbitration provision to resolve alleged violations of such provisions." N.Y. Civ. Serv. Law § 75-b(3)(b).[19] Thus, Plaintiff is barred from asserting

---

[19] *See also* Dkt. 26 ex. 7 (DOE–UFT CBA) arts. 17(d)(2) ("The disciplinary process should never be used to retaliate against whistleblowers or for any other illegal reasons."), 18(a)-(c) (requiring that grievances "involving alleged violation of any term of this Agreement" proceed through multiple administrative appeals and then, at UFT's

a claim under Section 75-b(2)(a) in this Court, and Count Eight is dismissed. *See Healy*, 2006 WL 3457702, at *6; *Munafo*, 2003 WL 21799913, at *31.[20]

Because Plaintiff concedes that she is subject to a CBA whose grievance-and-arbitration provisions displace a civil action under Section 75-b, she "can plead no set of facts that would entitle [her] to relief" under that statute. *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001). Accordingly, leave to amend Count Eight is denied as futile.

## IX. Plaintiff's Contract Claims

### A. Count Nine: Claim for Breach of Contract

Defendants' motion to dismiss Count Nine, which alleges common-law breach of an employment contract, is granted. "New York . . . recognize[s] an action for breach of contract when plaintiff can show that the employer made its employee aware of an express written policy limiting the right of discharge and the employee detrimentally relied on that policy in accepting employment." *Lobosco v. N.Y. Tel. Co./NYNEX*, 751 N.E.2d 462, 465 (N.Y. 2001). Under this theory, "[p]olicies in a personnel manual specifying the employer's practices with respect to the employment relationship, including the procedures or grounds for termination, may become a part of the employment contract." *Baron v. Port Auth.*, 271 F.3d 81, 85 (2d Cir. 2001). "To establish that such policies are a part of the employment contract, an employee alleging a breach of implied contract must prove that (1) an express written policy limiting the employer's right of

---

sole discretion, through final and binding arbitration); Dkt. 1 (Compl.) ¶¶ 93 ("On October 6, 2017, plaintiff appealed her termination as per the Collective Bargaining Agreement . . . ."), 110 ("By letter dated April 26, 2018, the UFT notified plaintiff that the union would not appeal her case to arbitration.").

[20]     Contrary to Plaintiff's argument, *see* Dkt. 30 (Mem. in Opp. to MTD) at 23, *Seung-Yong Ok v. New York City Department of Education*, 18-CV-0392, 2018 WL 2121562, at *3 (E.D.N.Y. May 8, 2018), did not suggest that exhaustion of CBA-provided grievance-and-arbitration procedures is excused where a plaintiff's Section 75-b claim is "factually intertwined" with the plaintiff's accompanying claims under 42 U.S.C. § 1983. Rather, the case suggests that it may be appropriate to stay proceedings on a Section 75-b claim pending resolution of disciplinary proceedings under New York Education Code section 3020-a—proceedings that are not at issue in this case.

discharge exists, (2) the employer (or one of its authorized representatives) made the employee

aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or

continuing employment." *Id.* "[T]his is a difficult pleading burden," and "routinely issued

employee manuals, handbooks and policy statements should not *lightly* be converted into binding

employment agreements," *id.* (internal quotation marks, alterations, and footnote omitted).

At the outset, the Court resolves lingering confusion over the contract Plaintiff alleges

Defendants breached—confusion entirely created by the vagueness of Count Nine. *See* Dkt. 1

(Compl.) ¶¶ 213-16. In her opposition to Defendants' motion, Plaintiff clarified that Count Nine

is premised on Defendants' purported breach of DOE rules and policies that she contends formed

part of the employment contract between her and DOE. *See* Dkt. 30 (Mem. in Opp. to MTD) at

18-20. The Court accepts Plaintiff's clarification and therefore rejects Defendants' contention

that Count Nine must be dismissed to the extent it is premised on violation of Plaintiff's rights

under the DOE–UFT CBA, *see* Dkt. 25 (Mem. in Supp. of MTD) at 20-22; Dkt. 33 (Reply in

Supp. of MTD) at 8.[21]

Count Nine fails as a matter of law for a multitude of reasons. First, Plaintiff has failed to

allege adequately that the purported DOE rules and policies on which she relies—specifically,

(1) Section 9.17 of DOE's Rules and Regulations Governing Non-Pedagogical Administrative

Employees, (2) certain alleged "OSI Instructions," (3) an unidentified statement allegedly made

---

[21]    The Court does not blame Defendants for their (mis)interpretation of Count Nine: the Complaint *does* allege noncompliance with the CBA, *see* Dkt. 1 (Compl.) ¶¶ 124-26, 135, 145, although it does not actually assert a claim premised on that alleged noncompliance.

   The Court notes that the theory on which Count Nine is premised—the alleged breach of an employment policy that is "implied" into the terms of an employment contract—differs from a claim of breach of an "implied-in-fact" contract, which is one "evidenced by the acts of the parties and not by their verbal or written words," *Miller v. Schloss*, 218 N.E. 337, 406-07 (N.Y. 1916). Because Plaintiff asserts the former type of claim and not the latter, Defendants' argument that an implied-in-fact contract cannot arise where there is an express agreement on the same topic, *see* Dkt. 33 (Reply in Supp. of MTD) at 8, is neither here nor there.

by "DOE Office of Labor Relations (NYC Schools)," and (4) a "frequently asked questions" document allegedly produced by the same office, *see* Dkt. 1 (Compl.) ¶¶ 120-23, 127-34—are "part of [her] employment contract" with Defendants, *Baron*, 271 F.3d at 85. Even if these documents were intended to "limit[] [defendants'] right of discharge," *id.,* which is questionable,[22] Plaintiff altogether fails to allege that any Defendant (or any authorized representative of Defendants) "made [her] aware of" these documents before or during her employment, *id.* Plaintiff also fails to allege that she "detrimentally relied" on any of these documents "in accepting or continuing employment." *Id.* Count Nine therefore fails to plead that any limitations these documents may have imposed on Defendants' ability to terminate Plaintiff had "become a part of [her] employment contract." *Id.*[23]

Even if Plaintiff had adequately pleaded knowledge and reliance, she has failed to explain why some of the documents she identifies "should . . . be converted into binding employment agreements," *Baron*, 271 F.3d at 85. The Second Circuit has made clear that Plaintiff's burden of pleading an implied limitation on an employer's right to terminate an employee is a "difficult" one and that routinely issued employee manuals do not magically become binding employment agreements. *Id.* To the extent Plaintiff premises her contract claim on unidentified "OSI Instructions," a frequently-asked-questions document allegedly produced by the DOE Office of Labor Relations, and another, unidentified statement made by the same office, *see* Dkt. 1 (Compl.) ¶¶ 127-34, the Complaint lacks sufficient factual detail explaining what these

---

[22]     Section 1 of the DOE Rules and Regulations Governing Non-Pedagogical Administrative Employees, for instance, suggests that those rules may have been superseded by the termination provisions laid out in the DOE–UFT CBA. *See* App. A § 1.

[23]     In her opposition, Plaintiff avers that she "was aware of these policies and relied upon these policies, believing that she was entitled to progressive discipline for any misconduct." Dkt. 30 (Mem. in Opp. to MTD) at 19. Even if true, allegations to this effect are missing from Plaintiff's Complaint, so the Court will not consider them. *See Verdi*, 306 F. Supp. 3d at 550 n.16. Plaintiff may include factually detailed allegations demonstrating her knowledge and reliance in her Amended Complaint, if she chooses to amend this claim.

documents and statements are, to whom they were addressed, and how they became an actionable part of Plaintiff's employment contract.

The Court makes one final note regarding Plaintiff's theory that Section 9.17 of the DOE's Rules and Regulations Governing Non-Pedagogical Administrative Employees, *see* App. A, was a part of her employment contract and obligated Defendants to provide her with certain pre-termination procedures. Plaintiff's Complaint alleges that Section 9.17 "identifies the Administrative Trials Unit" and required some or all of the Defendants to "schedule a Technical Assistance Conference (TAC) with ATU for a complete review of the employee's personnel file and any related discussions," a process that was not followed here. Dkt. 1 (Compl.) ¶¶ 120-23. But Section 9.17, which the Court has held is integral to Plaintiff's Complaint, *see supra* Pt. I, does *not* obligate Defendants to provide the ATU-review procedure that Plaintiff alleges she was denied. *See* App. A § 9.17. If Plaintiff premises her breach-of-contract claim on the fact that Defendants did not schedule a TAC with the ATU, then the claim is not plausibly pleaded.

Because of these defects, Count Nine is dismissed. The Court will, however, grant Plaintiff leave to amend this claim.

### B. Count Ten: Claim for Tortious Interference with Contract

Defendants' motion to dismiss Count Ten, which asserts a common-law claim for tortious interference with a contract, is denied. Defendants' only argument is that "DOE, a party to the CBA, cannot be liable for tortious interference with that very contract." Dkt. 33 (Reply in Supp. of MTD) at 9-10; *see also* Dkt. 25 (Mem. in Supp. of MTD) at 22 n.7 (same argument). This argument misunderstands Plaintiff's claim, which rests *not* on any purported interference with her rights under the DOE–UFT CBA but rather on alleged interference with her rights under her employment contract with DOE. *See* Dkt. 1 (Compl.) ¶¶ 217-23 ("In their actions, the individual defendants intentionally and/or recklessly interfered with and/or caused the breach of

plaintiff's employment contract with the DOE.").  More importantly, Count Ten is against the individual defendants only, who were parties to neither the CBA nor Plaintiff's alleged contract with DOE.  *See id.*  Defendants' argument as to DOE is, therefore, denied as moot.[24]

### C.  Defendants' Contention That UFT is a Necessary Party

Because neither Count Nine nor Count Ten is premised on a violation of Plaintiff's rights under the DOE–UFT CBA, the Court rejects Defendants' argument that those claims "must be dismissed for failure to name a necessary party," namely UFT.  Dkt. 25 (Mem. in Opp. to MTD) at 22-23 (capitalization altered).  This argument, as Defendants acknowledge, is contingent on "the extent [to which] plaintiff is still basing her breach or tortious interference claims on the CBA."  Dkt. 33 (Reply in Supp. of MTD) at 8-9.  As Plaintiff has disclaimed any cause of action based on a violation of or interference with her rights under the CBA, Defendants' joinder argument is moot.[25]

## X.  Defendants' Requests for a Stay and for Issue Preclusion

In their motion to dismiss, Defendants requested that the Court stay proceedings in this case pending the Supreme Court's disposition of Plaintiff's N.Y. C.P.L.R. section 7803 petition.  *See* Dkt. 25 (Mem. in Supp. of MTD) at 23-24.  Because the Supreme Court resolved Plaintiff's petition on November 26, 2018, *see* Dkt. 34 ex. 1, the request for a stay is denied as moot.

In a December 27, 2018 letter, Defendants contend that Plaintiff is precluded from relitigating in this Court the two issues that Defendants argue the Supreme Court decided in disposing of Plaintiff's petition: (1) that New York law barred Plaintiff's petition because she

---

[24]    In denying Defendants' request that this claim be dismissed as against DOE, the Court does not express any opinion on whether Count Ten adequately states a claim against the individual defendants.  Because Defendants have failed to marshal any argument to this effect, the Court has no basis on which to rule.

[25]    Counsel for defendants is advised to cite and apply *federal* law governing joinder of parties rather than state law when litigating in federal court.  *See* Dkt. 25 (Mem. in Supp. of MTD) at 22-23 (citing N.Y. C.P.L.R. section 1003 and state cases interpreting it).

failed to exhaust the DOE–UFT CBA's three-step review procedure for termination decisions, and (2) that the statute of limitations barred any attempt to amend the petition to add UFT as a party. *See* Dkt. 34 at 2. Because neither of these purported holdings by the Supreme Court bears on the disposition of Defendants' motion to dismiss, the Court need not resolve their preclusive effect in this Court at this stage. Defendants remain free to renew their preclusion argument at later stages of the litigation should that be appropriate and warranted by the facts.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss [Dkts. 24-26] is GRANTED IN PART and DENIED IN PART. Specifically,

- The City of New York's motion to dismiss the Complaint is GRANTED. All counts except Counts Four and Eight are dismissed without prejudice. Counts Four and Eight are dismissed with prejudice.

- Defendants' motion to dismiss Counts One, Two, and Nine is GRANTED; those counts are dismissed without prejudice.

- Defendants' motion to dismiss DOE and the individual Defendants in their official capacities from Count Three is GRANTED. Count Three is dismissed as against DOE and the official-capacity Defendants without prejudice. Defendants' motion to dismiss Count Three as again the individuals in their personal capacities is DENIED.

- Defendants' motion to dismiss Counts Four and Eight is GRANTED. Counts Four and Eight are dismissed with prejudice.

- Defendants' motion to dismiss Counts Five and Six are GRANTED as to the discrimination claims and DENIED as to the retaliation claims. As to the discrimination claims, Count Five and Six are dismissed without prejudice.

- Defendants' motion to dismiss Count Seven is DENIED.

- Defendants' motion to dismiss Count Ten is DENIED.

Regarding the claims that have been dismissed without prejudice, Plaintiff may, if she wishes, amend her Complaint to correct the deficiencies identified above. Plaintiff must file her Amended Complaint, if any, no later than **March 29, 2019**. Any Amended Complaint must be accompanied by a redline version of the Amended Complaint showing differences between that document and the Complaint. If Plaintiff does not wish to file an Amended Complaint, she must submit a letter no later than **March 29, 2019** advising the Court of that fact.

In any case, the parties must appear for an initial pre-trial conference on **March 22, 2019 at 10:00 a.m.** No later than **March 14, 2019**, the parties must submit a joint pre-conference letter and a jointly proposed case-management plan as described in Paragraphs 2 and 3 of the Notice of Initial Pretrial Conference [Dkt. 27].

If Plaintiff files an Amended Complaint, Defendants must move against or answer the Amended Complaint no later than **April 26, 2019**. Plaintiffs' opposition to any motion (or a letter notifying the Court of an intent not to oppose the motion) is due no later than **May 17, 2019**. Defendants' reply in support of their motion, if any, is due no later than **May 24, 2019**.


**SO ORDERED.**

Date:  **February 28, 2019**  
      **New York, New York**

                            **VALERIE CAPRONI**  
                            **United States District Judge**



# New York City

# Department of Education

DIVISION OF
H U M A N
RESOURCES

# Rules and Regulations

# Governing Non-Pedagogical

# Administrative

# Employees

**Office of Support Services**
**65 Court Street – Room 504**
**Brooklyn, New York 11201**

Updated January 30, 2004

# Table of Contents

**Section**                                                          **Page**

Section I - Introduction                                                3

Section 2 - Personnel Board                                             4

Section 3 - Working Hours                                               5

Section 4 – Annual Leave                                                7

Section 5 – Sick Leave                                                  11

Section 6 – Other Leaves                                                16

Section 7 – Overtime and Meal Allowance                                 22

Section 8 – Probationary Period                                         24

Section 9 – Conduct and Discipline                                      26

Section 10 – Injuries in the Line of Duty                               31

Section 11 – Salaries                                                   32

Section 12 – Interoffice Transfers                                      32

Section 13 – Appeals                                                    32

Section 14 – Bylaws                                                     32

# Rules and Regulations
## Governing Administrative Employees

## SECTION 1-INTRODUCTION

The RULES AND REGULATIONS FOR ADMINISTRATIVE EMPLOYEES have been established for the conduct, welfare and service of administrative employees of the Department of Education and are promulgated for the guidance of administrative employees, office heads and supervisors, including members of the pedagogical staff who supervise administrative employees. A copy of these rules will be made available to all concerned and all will be expected to be familiar with and to adhere to them. An "administrative employee" is defined as an employee serving in a classified civil service title.

For employees covered by any agreement between the Department of Education and a union or by the Department of Education's Management Pay Plan (Schedule), Alternate Career and Salary or other Pay Plans, any provisions of such agreement or pay plan inconsistent with these rules and regulations must take precedence.

Inquiries concerning these rules and regulations should be addressed to:

**Division of Human Resources**

**Office of Support Services**

**65 Court Street – Room 504**

**Brooklyn, New York 11201**

**(718) 935-2282**



## SECTION 1

# SECTION 2 — PERSONNEL BOARD

This section is currently under revision.

# SECTION 3 — WORKING HOURS

**3.1**    The working hours of all administrative employees, unless otherwise authorized by collective bargaining agreements, are from 9:00 a.m. to 5:00 p.m., Monday through Friday, with one (1) hour for lunch daily.

The Department of Education may fix other hours for certain employees pursuant to budgetary modifications made to effectuate *prevailing rate of pay* determinations made by the Comptroller under the Labor Law and the rate-of-pay agreements entered into between employee representatives and the City. *(See Part II of this book for clarification)*

At the Chancellor's discretion, a shortened summer workday schedule beginning July 1 and terminating on Labor Day may be granted to City and Department of Education employees for whom there are no air conditioned facilities. Employees meeting this criterion must complete one (1) year of service in order to become eligible for this schedule.

**3.2**    A division or office head with the approval of the director, executive director or superintendent may, for satisfactory reasons, vary the daily working hours of one or more employees, provided that the total number of working hours is not reduced. To meet seasonal or emergency conditions, an office head may require longer service from one or more employees in which event due time allowance is to be made for the extra service. All employees are allowed, under the provisions mandated by State Labor Law at least thirty (30) minutes for a meal period. An employee who works a shift of more than five (5) hours must take at least thirty (30) minutes off for a meal period.

**3.3**    The regular holidays with pay for annual and monthly employees are:

| | | |
|---|---|---|
| New Year's Day | Good Friday | Columbus Day |
| Martin Luther King, Jr. Day | Memorial Day | Veterans' Day |
| Lincoln's Birthday | Independence Day | Thanksgiving Day |
| Washington's Birthday | Labor Day | Christmas Day |

**NOTE:** Election Day has been designated as a "floating holiday".

If any of these holidays falls on a Sunday, employees normally scheduled to work the immediately following Monday will be given the Monday off with pay.

If Christmas Day or New Year's Day falls on a Saturday, employees normally scheduled to work the immediately preceding Friday will be given the Friday off with pay.

If any other holiday falls on a Saturday, the employee is not entitled to the prior day off.

In addition to the regular paid holidays listed above, such days of religious observance for which the schools are closed and which are designated by the Chancellor as holidays for employees will be regular paid holidays when falling on regular work days. The offices of the Department of Education may also be closed in cases of emergency and on any other days which the Department or the Chancellor may select.

If an employee is absent without pay on the day before or after a day when the offices of the Department of Education are closed, he/she may be denied pay for such day.

*SECTION 3*

**3.4**     Each employee must personally record his/her daily time of arrival and departure in the manner approved by the Division of Human Resources.  Under no circumstances may an employee record the time of other employees.  Each office is to be responsible for the maintenance of its employees' time records.

**3.5**     Employees are expected to make every effort to report to work despite work stoppages, snowstorms, power failures, or other conditions of emergency that may make travel to and from work difficult.  This rule will govern even when schools have been closed by the Chancellor.  If schools are closed, employees should be aware that administrative offices might still be open.

The following regulations apply to absences and lateness during such emergencies:

**ABSENCES** – No absences shall be excused.  Any absence will be charged against unused annual leave or compensatory time balances upon presentation of written evidence by the employee that it was physically impossible to report to work.

**LATENESS** – If employees anticipate a delay in reporting to work locations because of previously announced or emergency problems, it is expected that they will allow extra time for travel.  Individuals should present claims to the appropriate office head in cases of hardship, and the office head will render a decision.

The Chancellor is responsible for issuing a directive in cases of emergency.

**3.6**     Employees should not line up at the time clock in advance of the time they are scheduled to clock out at the end of the day or at lunch hour.

**3.7**     Employees covered by collective bargaining agreements working in Central Department of Education and district offices are permitted to extend their meal periods an extra twenty (20) minutes on paydays in order to transact banking business.  This extra time is not to be taken at any other time or used in any other manner, except by special permission of the office head.  If an employee is absent on the day the paychecks are distributed, he/she is not entitled to receive the extra time upon return to service.

**3.8**     Administrative employees may be taken off the time clock for any of the following reasons:

❖   The employee has twenty (20) years of service and the approval of the office head;
❖   The employee's title is at the level of Principal Administrative Associate or an equivalent title or higher, with at least ten (10) years of service, and a history of exemplary attendance;
❖   The employee is in the Managerial Pay Plan;
❖   The employee has less than twenty (20) years of service but has the recommendation of the division's Executive Director.
<span style="color:red">❖   The division's Executive Director may opt to remove all or select categories of employees from the time clock without regard to years of service provided adequate controls are in place to monitor time and attendance.</span>

An employee off the time clock who is found abusing the privilege may be required to punch a time clock.

Timesheets must be individually approved by an authorized official.



*SECTION 3*

# SECTION 4 – ANNUAL LEAVE

**4.1**  Employees earn an annual leave allowance, which may be used for vacation, personal business or purposes of religious observance.

**4.2**  The annual leave allowance for annual and hourly employees will be computed on the following basis, unless otherwise specified by collective bargaining agreements and special circulars issued by the Chancellor.

| ANNUAL EMPLOYEES | | Annual Allowance (#of work days) | Monthly Accrual | | |
|---|---|---|---|---|---|
| | | | D | H | M |
| I. | **Employees beginning employment before October 1, 1976** | | | | |
| | a. From beginning of first year to completion of seventh year | 20 | 1 | 4 | 40 |
| | b. From beginning of eighth year to completion of fourteenth year | 25 | 2 | 0 | 35 |
| | c. From beginning of fifteenth year | 27 | 2 | 1 | 45 |
| | | | | | |
| II. | **Employees beginning employment October 1, 1976 through June 30, 1978 (reverted on July 1, 1978 to 20 work days -1 D 4H 40M)** | 15 | 1 | 1 | 45 |
| | | | | | |
| III. | **Employees beginning employment July 1, 1985[1]** | | | | |
| | a. From beginning of first year | 10 | 0 | 5 | 50 |
| | b. From beginning of second year to completion of third year | 13 | 1 | 0 | 35 |
| | c. From beginning of the fourth year to completion of the fourth year | 15 | 1 | 1 | 45 |
| | d. From beginning of the fifth year to completion of the seventh year | 20 | 1 | 4 | 40 |
| | e. From beginning of the eighth year to completion of the fourteenth year | 25 | 2 | 0 | 35 |
| | d. From beginning of the fifteenth year | 27 | 2 | 1 | 45 |
| | | | | | |
| IV. | Employees beginning employment July 1, 1991 | | | | |
| | a. From beginning of first year to completion of fourth year | 15 | 1 | 1 | 45 |
| | b. From beginning of fifth year to completion of seventh year | 20 | 1 | 4 | 40 |
| | c. From beginning of eighth year to completion of fourteenth  year | 25 | 2 | 0 | 35 |
| | b. From beginning of fifteenth year | 27 | 2 | 1 | 45 |

# SECTION 4

---

[1] The following titles, beginning July 1, 1985, are covered under No. I:  Nurses, Therapists, Original Jurisdiction and Managerial titles, in addition to employees with continuous service in a NYC public agency.

Accrual of annual leave hours is based on the number of years of service AND total number of hours worked each week.

Hourly employees must be in full pay status for at least 17½ hours per week to be eligible to accrue time for that week, otherwise weekly hours worked are not counted toward accruals.



**HOURLY EMPLOYEES**

*Effective July 1, 1990*

| | |
|---|---|
| Beginning of first year | 1 hour accrued for every 27 hours worked |
| Beginning of second year | 1 hour accrued for every 22 hours worked |
| Beginning of fourth year | 1 hour accrued for every 21 hours worked |
| Beginning of fifth year | 1 hour accrued for every 15 hours worked |

*Effective July 1, 1991*

| | |
|---|---|
| Beginning of first year | 1 hour accrued for every 15 hours worked |
| Beginning of fifth year | 1 hour accrued for every 11 hours worked |

Upon working as a full-time hourly for three (3) consecutive years and continuing to work full time, the employee is eligible to earn time as an annual employee. Hourly employees, in full pay status, will accrue time on a monthly basis, beginning with fifteen (15) days per year, up to the maximum prorated amount of twenty (20) annual leave days per year.

However, no hourly employee shall earn more annual leave than an annual employee in the same or equivalent title would earn on an annual basis. Under no circumstances are hourly employees eligible to receive paid holidays.

4.3     Prior service with the Department of Education or with another New York City public agency, or both, will be credited in the calculation of total service for annual leave purposes under the following circumstances:

&#10070;     The employee is a permanent employee and is subsequently reinstated or reappointed within one (1) year to a permanent position with the Department of Education;

&#10070;     The employee is a permanent employee whose service was terminated without fault or delinquency on his/her part because of abolition of his/her position and is subsequently reappointed to a permanent position with the Department of Education, regardless of the length of time between periods of service;

*SECTION 4*

> ❖ The employee has prior service in the capacity of a provisional employee in the Department of Education and there has been no break in service of thirty-one (31) calendar days or more;
>
> ❖ The employee has prior service in the capacity of a permanent or provisional employee in a New York City public agency and there has been no break in service of thirty-one (31) calendar days or more.

**4.4**    Prior service will not be calculated in the computation of total service for annual leave purposes if the service was with an agency of the State or Federal government.

**4.5**    Upon transfer of a permanent employee, or appointment of an employee who has continuous service in another New York City public agency from an eligible list, or to a non-competitive position, annual leave balances up to the maximum of two (2) years accrued (unless otherwise stipulated in any collective bargaining agreement or otherwise authorized) will be transferred with the employee upon submission of an appropriate substantiating statement to the Division of Human Resources, such statement to be certified by the Division of Human Resources.

   **NOTE:**  Continuous service is defined as service which has not been interrupted by a break of thirty-one (31) calendar days or more, unless otherwise stipulated by law or collective bargaining agreement.

**4.6**    Annual leave will be credited for time served while on full pay status.  Annual leave may also be granted for the first year of a military leave of absence and for the first six (6) months of absence while receiving Workers' Compensation.  Employees serving in the military reserves are allowed up to thirty (30) calendar days in a calendar year with pay to serve in the reserves, without charge to their annual leave balance.  S*ee Section 6.8.11*

**4.7**    Annual leave credits are earned during a calendar month, and the computation date will be the first day of the following month.  In order to be credited with annual leave in any month, the employee must be on full pay status for at least fifteen (15) calendar days in the month.

**4.8**    Deductions for time used during a month will be made on the first day of the following month.

**4.9**    The vacation year begins on May 1 and ends on April 30 of the following year.  At the end of each vacation year, the annual leave balance may not exceed two (2) years' leave accrual.  Annual leave exceeding two (2) years' accrual will be transferred from the annual leave balance to the sick leave balance, unless a written request for permission to carry over such credit and a plan for use of this carried over annual leave in the following vacation year has been approved by the appropriate office head.  Information as to all accumulated leave balances (sick leave, annual leave, military leave, and compensatory time) will be given to each employee in writing at least once a year.  If the information has been given more frequently, such practice will be continued.

*SECTION 4*

**4.10** Earned annual leave allowance should be taken at a time convenient to the employee's department and only upon the express written permission of the office head or his/her authorized representative.

**4.11** The normal unit of charge against annual leave allowance for vacation and personal business is one hour; however, if prior permission is granted by the bureau head or his/her authorized representative, time lost shall be on a minute for minute basis. Smaller units of charge are authorized for time lost due to tardiness and religious observance.

**4.12** If an employee has exhausted his/her earned annual leave balance, absences of one-half day or more will result in a payroll deduction, unless the office head grants permission for such absence, to a maximum of ten (10) days to be charged against future earned annual leave.

**4.13** Permanent, provisional, and hourly employees may not be permitted to use annual leave allowances for other than religious holidays until they have completed four (4) months of service, except by permission of the Executive Director.

**4.14** Employees whose employment is temporary and limited to all or parts of the months of June, July, August, or September, and who are designated as summer employees or summer replacements are excluded from these annual leave benefits.



*SECTION 4*

# SECTION 5 — SICK LEAVE

**5.1**   Sick leave is to be used only for personal illness of the employee, or in accordance with applicable collective bargaining agreements or law.



**ANNUAL EMPLOYEES**

Employees hired prior to
July 15, 1996

| | |
|---|---|
| **Beginning of first year** | **12 sick days per annum (unless otherwise specified in a collective bargaining agreement)** |

**Employees hired effective July 15, 1996 through March 31, 2000 [1]**

| | |
|---|---|
| **Beginning of first year** | **11 sick days per annum (6 hours, 25 minutes per month)** |
| **Beginning of fourth year** | **12 sick days per annum (unless otherwise specified in a collective bargaining** |

**Employees hired effective April 1, 2000 - present**

| | |
|---|---|
| **Beginning of first year** | **12 sick days per annum (unless otherwise specified in a collective bargaining** |

[1]This provision expired April 1, 2000.  Therefore, effective April 1, 2000, employees hired during the period July 15, 1996 through March 31, 2000 shall accrue twelve (12) sick leave days per annum (unless the applicable collective bargaining agreement provides for a January 1, 2000  effective date.)

Time recorded on the payroll at the full salary, full period of military service, and the first six (6) months of absence while receiving Workers' Compensation payments will be considered as time served by the employee for the purpose of earning sick leave credits.

# SECTION 5

**5.2**

Accrual of sick leave hours is based on the total number of hours worked each week. Hourly employees must be in full pay status for at least 17½ hours per week to be eligible to accrue time for that week, otherwise their hours worked are not counted toward sick leave accruals.

Hourly employees who work thirty-five (35) hours per week for three (3) or more consecutive years in continuous service will accrue such leave time after the third year as if they were annual employees. For purposes of this section, continuous service is defined as working with no more than a two (2) week break in service.

❖ Employees hired *prior to July 14, 1996* AND *after April 1, 2000*, who work half-time or more, will be credited with a sick leave allowance with pay of one (1) hour for each twenty (20) hours of service with pay.

❖ Employees hired during the period of *July 15, 1996 through March 31, 2000*, who work half-time or more, will be credited with a sick leave allowance with pay of one (1) hour per each twenty-two (22) hours of service with pay for the first three (3) years of service.
(**Note**: This provision expires April 1, 2000. Therefore, effective April 1, 2000, employees hired during the period July 15, 1996 through March 31, 2000, will be credited with a sick leave allowance with pay of one (1) hour for every twenty (20) hours of service with pay (unless the applicable collective bargaining agreement provides for a January 1, 2000 effective date.)

However, no hourly employee will earn more sick leave than an annual employee in the same or equivalent title would earn on an annual basis.

**5.3** Sick leave credits are earned and recorded monthly on the record of each employee. This record will include all sick leave which has been earned up to that time. The accumulation of sick leave is unlimited.

**5.4** Sick leave credits are earned during a calendar month, with the computation date being the first day of the following month. In order to be credited with sick leave in any month, the employee must be on full pay status for at least fifteen (15) calendar days in the month.

**5.5** Upon transfer of a permanent employee, or appointment of an employee who has continuous service in a New York City public agency from an eligible list or to a noncompetitive position, the sick leave balance will be transferred with the employee upon submission of an appropriate substantiating statement to the Division of Human Resources. Such statement will be certified by the Division of Human Resources.

**NOTE:** For purposes of this section, continuous service is defined as service that has not been interrupted by a break of thirty-one (31) calendar days or more.

**5.6** An employee who is reappointed from a Civil Service list within thirty-one (31) calendar days of the termination of his/her services, and an employee who is reappointed from a preferred list, regardless of the time between separation and reappointment, will be credited with earned, unused sick leave balances resulting from the previous period of service.

**SECTION 5**

**5.7**     Upon reinstatement of an employee to a permanent position, the unused sick leave balance at the time of resignation or layoff will be restored to the employee's credit.

**5.8**      Provisional and temporary employees are entitled to sick leave privileges and will be subject to the same restrictions as permanent employees, except that they are required to submit physician's certificates for any sick leave used during their first three (3) months of employment.

**5.9**     An employee is responsible for immediately notifying his/her supervisor of an absence, stating the cause and probable duration of such absence and his/her exact location. In the case of an illness exceeding five (5) working days, a report on the progress of the illness, by mail or by telephone, to the office head at weekly intervals thereafter, should be made by the employee or by someone on behalf of the employee.

**5.10**    To request that absences be charged to the sick leave allowance, the employee is required to submit the appropriate application to the office head or supervisor.

**5.10.1**  Submission of a physician's certificate in the prescribed form with the application will be waived for self-treated absence up to and including (3) three consecutive workdays. The office head is authorized to approve such applications, but if there is substantial evidence of abuse of this privilege, the supervisor may request medical documentation to substantiate the illness.

In a six (6) month period, applications for excuse of absence due to self-treated illness will be approved for a maximum of six (6) days of absence.

**5.10.2**  If an employee is absent and required to submit a physician's certificate due to illness, he/she must submit a physician's certificate within (3) three days after returning to duty. The certificate should be in the form of a letter on the physician's stationery with a signature or stamp and should include the following information:

> ❖ **The specific nature of the illness and the condition of the employee adequate to justify the absence:** If the physician decides that the diagnosis and medical data should not be directed to lay officials of the Department of Education, he/she may submit this medical information to the Medical Director of the Department of Education. The physician should indicate on the certificate that this action will be taken.

> ❖ **Dates:**  The dates during which the employee was under the physician's care and the dates on which he/she was seen and treated by the physician.

> ❖ **Hospitalization:** If the employee was hospitalized, the physician should indicate the dates of hospitalization and the name of the hospital.

A physician's certificate signed/stamped by an optometrist, ophthalmologist, osteopath, podiatrist or an X-ray or laboratory technician is acceptable. Absence certificates signed by an optometrist are acceptable for a maximum of one-half day of absence only.

Office heads or supervisors are authorized to approve such requests, where the employee has sufficient time balances to cover the absence and where no additional time is requested. Exceptional cases and appeals from decisions of the office head will be forwarded to the Chief Executive (or designee) of the Division of Human Resources who will render a ruling on it.

**SECTION 5**

**5.11** Physicians' certificates for the following types of absences are to be submitted to the office head or supervisor for review. If the office head or supervisor deems it necessary the certificate(s) may be forwarded with a recommendation, to the Division of Human Resources, for referral to the medical staff. The medical staff will review such cases and approve the absence or indicate its recommendations under the following circumstances:

  ❖ **Absences of more than thirty-one (31) calendar days, regardless of the amount of time balance to the employee's credit**. In cases of protracted disability, such certificates are to be presented to the Division of Human Resources at the end of each month of continued absence.

  ❖ **Advances of time allowance for sick leave purposes**, pursuant to Section 5.13 where employees have exhausted all time allowances, without regard to duration of absence.

  ❖ **Leaves of absence without pay** for health reasons in excess of thirty-one (31) calendar days.

  ❖ **Leaves of absence with pay** for health reasons, regardless of duration.

The head of the office, executive director, director, superintendent, or supervisor may delegate authority to review and approve such certificates to a deputy or other principal assistant. Timekeepers will not be assigned this responsibility.

**5.12** When an absence due to illness exceeds the earned sick leave time, the additional time is to be charged as absence against accrued annual leave.

**5.13** Permanent employees who have exhausted all earned sick leave and annual leave balances due to personal illness and who have maintained a satisfactory rating, may, at the discretion of the Chief Executive (or designee), Division of Human Resources be permitted to use unearned sick leave allowance up to the amount earnable in one year of service, chargeable against future earned sick leave.

All requests submitted under this section must contain prominently indicated thereon, the fact that the absence, or part of it, is to be charged against an advance of sick leave allowance. Employees must state in their request to the Chief Executive (or designee), Division of Human Resources, their awareness that, upon their return, the Department of Education will recoup the employee's time as sick time is accrued. The office head will secure the timekeeper's verification of the attendance data recorded on the request, and forward the request with his/her approval or disapproval indicated thereon to the Chief Executive (or designee), Division of Human Resources.

**5.14** Permanent employees having ten (10) years of continuous service in a New York City public agency may, at the discretion of the Chief Executive (or designee), Division of Human Resources, be granted sick leave with pay for three (3) months after all credits have been used. In special instances, sick leave with pay may be further extended for one (1) additional three (3) month period with the approval of the Chief Executive (or designee), Division of Human Resources. Sick leave with pay is granted for a maximum of six (6) months, regardless of years of service after a ten (10) year period.

In exceptional circumstances, permanent employees with less than ten (10) years of New York City public agency service may make a special request to the Chief Executive of the Division of Human Resources (or designee) to be granted sick leave with pay as set forth above.

*SECTION 5*

The Chief Executive (or designee), Division of Human Resources will be guided in this matter by the nature and extent of illness and the length and character of service. The Division of Human Resources may request and receive such medical information and recommendations as it deems necessary to properly exercise its discretion.

**5.15** An employee who is on a leave without pay for any reason other than illness may not have any portion of this time charged against sick leave allowance.

**5.16** Health insurance coverage under the choice of plans provided to the employees will continue while the employee is in pay status. Employees on Workers' Compensation, maternity leave, or an authorized sick leave without pay, may be eligible for up to four (4) months of extended health coverage under Special Leave of Absence Coverage (SLOAC) after going off pay status.

**5.17** If the time record and/or performance of an employee indicate the need for a medical examination and/or consultation with the medical staff, it is within the superintendent's, executive director's, or director's discretion to have the employee report to the Medical Bureau for such an examination. The Chief Executive of the Division of Human Resources (or designee) upon request or independently is empowered to have an employee who reports ill visited by a member of the Medical Bureau of the Department of Education.

**5.18** Except with the approval of the Chancellor or designee(s), employees who are absent from duty due to illness may not go to places remote from their residences for recovery of health, treatment of illness, or other purposes affecting their mental or physical well-being, without submitting a physician's certificate satisfactory to the Medical Director of the Department of Education.

**5.19** An employee who is ill during his/her regularly scheduled vacation may not have such absence charged to sick leave allowance, except as otherwise provided in collective bargaining agreements. This absence will be deducted from the employee's annual leave balance, just as scheduled vacation would be. In cases of extended absence due to sudden serious personal illness, however, this rule may be waived, subject to the following provisions:

> ❖ If the employee was hospitalized, the entire period of illness may be charged against the sick leave balance.

> ❖ If there was no hospitalization, the first week of illness remains as scheduled vacation to be deducted from annual leave allowance, and the remainder of the illness may be charged against the sick leave allowance.



*SECTION 5*

# SECTION 6 — OTHER LEAVES

**6.1**     The Division of Human Resources will grant any leave of absence without pay required by law, such as military leave and leaves under the Family Leave Medical Act (FMLA). Leaves of absence without pay, other than maternity and childcare leave, may be granted to permanent employees by approval of the Division of Human Resources for a period not to exceed one (1) year. Extensions of such leaves may be granted upon recommendation of the Chief Executive (or designee), Division of Human Resources.

**6.2**     Each request for leave of absence without pay other than for maternity or childcare is to be submitted by the office head sufficiently in advance of the commencement of such leave to allow consideration by the Division of Human Resources; a statement on the application must indicate the office head's approval or disapproval.

**6.3**     While on leave of absence without pay for any reason, an employee may not accept any compensated employment unless specifically authorized by the Chancellor or his/her designee.

**6.4**     If an employee is absent for more than thirty (30) days without authorization, and has not applied for a leave of absence without pay, a leave of absence without pay for a period not exceeding three (3) months may be approved by the Division of Human Resources. Such requests may be initiated by the office head in a recommendation to or by the Division of Human Resources.

**6.5**     An employee granted a leave of absence with or without pay because of serious illness or for the purpose of restoration of health, or for other health reasons may, at the discretion of the office head, be required to submit medical documentation or to undergo evaluation by the Medical Bureau before reassignment to duty.

**6.6**     An employee who is a member of the Retirement System in Tier I or Tier II, who is granted a leave of absence without pay by the Division of Human Resources due to serious illness and/or for reasons under the Family and Medical Leave Act (FMLA) may, at the time when requesting either unpaid leave, also apply for permission from the Division of Human Resources to contribute to the Retirement System for the period of such leave in order to receive service credit. Upon receiving permission, the employee is responsible for contacting the proper Retirement System to receive credit, if appropriate. The Division of Human Resources, in acting upon such request, is guided by the following conditions:

> ❖ The recommendation of the office head is to be based upon satisfactory service of the employee during the five (5) years preceding the granting of leave of absence without pay.

> ❖ A maximum of one (1) year of credit over the entire period of service is allowable under this rule. This one year of credit is allowable for twelve (12) or more years of actual service following regular appointment, and immediately preceding the granting of such leave. This regulation may be interpreted to permit partial credit for a period of less than twelve (12) years of service, prorated, except that a fraction of less than six (6) months of service will be disregarded and a fraction of six (6) months or more will be considered as a full year for the purpose of application of this rule.

*SECTION 6*

❖ The number of days of absence without pay (other than formal leaves of absence without pay) during the five (5) year period of actual service immediately preceding the effective date of leave of absence will be subtracted from the number of calendar days of such leave of absence without pay, to determine the amount of time which may be recommended for retirement service credit.

**6.7**     An employee who returns from a leave of absence without pay for any reason may not use annual leave or sick leave time until he/she has served one (1) calendar month following the date of return to duty, and such employee may not be restored to the payroll for the purpose of taking earned annual leave or sick leave.

**6.8**     Absence of permanent/provisional employees for the reasons indicated below is excusable without charge to sick leave or annual leave balances, upon submission of the proper application and supportive documentation to the designated office head.  In the normal processing of these applications, the designated office head may request additional documentation from the employee.  The decision of the designated office head may be appealed to the Division of Human Resources.

**6.8.1**  *Funerals*:
Absence is not to exceed four (4) workdays in the case of death in the immediate family. The Division of Human Resources may excuse additional absence of one day for reasonable travel when such absence is necessary because of attendance at the funeral of a relative in the immediate family at a place remote from the City of New York.  The absence for travel must occur on a working day within either five (5) business days or seven (7) calendar days, either before or after the funeral, and be supported by appropriate documentation.

For the purpose of this rule, the term "immediate family" includes a parent, child, brother, sister, grandparent, grandchild, spouse or parent of a spouse, registered domestic partner or parent of, or any relative residing in the employee's household.  The relationship of the deceased to the applicant, the date of death, and the date of the funeral is to be shown on the application.

**6.8.2**  Absence of not more than one day due to attendance at the funeral of a brother-in-law, sister-in-law, son-in-law, daughter-in-law, niece, nephew, aunt, uncle of employee, or aunt, uncle, or grandparent of spouse or registered domestic partner, who is not a member of the immediate household.

**6.8.3**  Absence for the purpose of attending, in a representative capacity, the funeral of an associate employee or other person connected with the department.  The approval of the supervisor or appropriate office head is sufficient documentation for this purpose.

**6.8.4**  *Jury Duty*
The employee excused for jury duty is required to endorse the check received for services rendered as a juror to the New York City Department of Education.  If the check is not endorsed, the amount of money received by the employee from the appropriate governmental agency for the performance of jury duty, exclusive of reimbursement for carfare, will be deducted from his/her salary.  Employees are granted up to three (3) hours of excused absence for the purpose of obtaining a postponement, provided they work the balance of that particular day.

*SECTION 6*

17

**6.8.5** *Court attendance*

Under subpoena or court order where an employee appears in a case in which neither he/she nor anyone related to him/her in any way has any financial or personal interest whatsoever and where the employee's attendance is not required as a result of any other employment, occupation, or voluntary act on his/her part; the application to be accompanied by the subpoena or a statement from employee's supervisor that he/she has seen such subpoena and must state that neither he/she nor anyone related to him/her in any way has any financial interest.

**6.8.6** *Quarantine.*

Acceptable official evidence promulgated by an appropriate City, State, or Federal agency must be attached to the application.

**6.8.7** *Examinations*

Attendance at a New York City Civil Service examination, a licensing examination given by the Department of Education, or for an investigation interview or appointment interview in connection with such examination. The application must indicate the title of the examination and the name of the agency conducting the examination.

**6.8.8** *Attendance at conventions*

The Chancellor, or his/her designee, or Community Superintendent, or his/her designee, must authorize such absence.

**6.8.9** *Attendance before a legislative body*

The absence from duty on the part of any salaried officer or employee of the Department of Education for the purpose of advocating or opposing any legislative or other measure, or proposition, affecting the public schools or the public school system, before any official body having jurisdiction in the matter, is prohibited except by express permission of the Chancellor or designee, who will concurrently report the granting of such permission to the Division of Human Resources. Absence for the purpose of obtaining permission in pursuance of this rule will be considered absence from duty.

**6.8.10** *Blood donation*

Donation to the American Red Cross, or other legitimate organization engaged in this activity. The time to be excused for this purpose is to be taken at the time of the donation and consistent with city policy and/or guidelines.

**6.8.11** *Military or naval duty*

Time used for military or naval duty will be excused provided a certificate from the Commanding Officer is attached to the application. This certificate should indicate that the duty was actually performed on the specified dates. These absences will be excused without charge for a period of up to twenty-two (22) working days or thirty (30) calendar days per year. *See Section 4.6*

**6.8.12** *Appearance before an official authority*

In connection with the Selective Service Act, provided the notice from the official authority is attached to the application that includes the date and arrival/departure time.

**6.8.13** *Graduations*
Absence of not more than one (1) day to receive a degree from a college or university or to attend the graduation of his/her child from a kindergarten/elementary school, intermediate school, junior high school, high school, or college, or to attend the graduation of his/her spouse or registered domestic partner from a college or university.  The application should indicate the exact time of day the exercises were held, since absence to attend a graduation held during working hours only will be excused.

**6.8.14**  In addition to the above reasons, absence may be excused with pay for such other legitimate purposes as the Division of Human Resources may, upon presentation of proper evidence, consider justified.

**6.9**  *Terminal Leave:*
The Division of Human Resources will grant terminal leave with pay in accordance with applicable collective bargaining agreements, regulations, or pay plans effective during the course of employment.  Terminal leave is granted in addition to accrued vacation balance and overtime credits and is computed by one of the following methods:

> ❖  *Method A*.
> *One (1) workday of terminal leave for each two (2) days of unused sick leave accumulation.*  The maximum accumulation of sick leave will be 200 days.  Terminal leave computed by this method is not to exceed 100 workdays.

> ❖  *Method B.*
> *One (1) calendar month of terminal leave for each twenty-two (22) days of unused accumulated sick leave.*  Terminal leave computed by this method shall not exceed one (1) calendar month for every ten (10) years of service, prorated at three (3) calendar days per year of service, or major fraction thereof.

For employees with less than ten (10) years of service, terminal leave is computed by *Method A*.  Employees with ten (10) or more years of service may elect *Method A* or *Method B*.

Employees who were employed by the Department on or before January 1968 and have completed ten (10) years or more of continuous service at the time of retirement will receive a minimum of one (1) calendar month of terminal leave without regard to unused sick leave accumulation.

The application for terminal leave should be sent at least thirty (30) days prior to the date of retirement to:

> **Division of Human Resources**
> **Office of Support Services**
> **65 Court Street - Room 504**
> **Brooklyn, New York 11201**

*SECTION 6*

**6.10    *Maternity/Child Care Leave***

A leave of absence for the purpose of maternity or childcare shall be granted to an employee, upon submission of the proper application and medical certification to the office head.  The office head will approve the application and forward it to the Division of Human Resources.

**6.10.1**   The employee who plans to take a leave of absence for the purpose of maternity or childcare should notify the office head of the initial date of the leave sufficiently in advance of that date to permit arrangements for replacement of the employee during the period of the leave to be made.  Maternity leave is subject to the terms and conditions of laws and regulations relating to leave with or without pay for personal illness, except as indicated below.

**6.10.2**   Maternity leave commences on the date specified in the application and ends six (6) weeks after the birth of the child or the termination of the pregnancy.  Such leave may be terminated sooner at the request of the employee in accordance with regulations.

**6.10.3**   The following payments will be made in connection with a maternity leave:

❖ The employee may charge absence during the period of the leave to her sick leave balance;
❖ After her sick leave balance is exhausted, the employee may charge absences to her annual leave and compensatory time balances.

**6.10.4**   Childcare leave will be granted to the natural or adoptive parent upon application.  Full-time employment while on such leave is prohibited.  If both parents are employees of the school system, only one of them may be on a childcare leave at a given time.

**6.10.5**   For an employee who has completed a maternity leave, after the birth of a child, the childcare leave commences at the termination of the maternity leave.  For any other employee, it will commence as granted.

**6.10.6**   Childcare leave terminates four (4) years from the beginning of the maternity leave if such has been granted.  Where no maternity leave has been granted, the childcare leave will terminate four (4) years after the date of commencement of the leave, or upon the child's fourth birthday, whichever date occurs first.

Childcare leaves may be terminated at the request of the employee in accordance with regulations.

Childcare leaves are without pay, except that employees may charge absences at the commencement of the leave to any compensatory time or annual leave balance.

**6.11**    Health insurance coverage  under the choice of plans provided to the employee will continue while the employee is in pay status and may be extended to the first four (4) months of a leave of absence without pay under Special Leave of Absence Coverage (SLOAC), provided that the ill or pregnant employee has exhausted all paid leave time.

**6.12    *Workers' Compensation*.**

With respect to employees covered by Workers' Compensation Law, upon receipt of an appropriate application substantiated by copies of the accident report and all statements submitted in connection therewith, employees may be excused without charge to sick leave or annual leave balances for the first week's absence caused by any injury sustained in the course of employment.

*SECTION 6*

In the event that such an employee is absent for a period longer than one week as a result of such injury, the employee may have the choice of one (1) of the following two procedures for the period extending beyond the first week of absence:

**Procedure 1**    To receive the full amount of his/her weekly salary provided that:

❖ The injured employee or any authorized person acting in his/her behalf makes the request in writing; and

❖ The injured employee or any authorized person acting in his/her behalf agrees that any absence is to be charged against his/her sick and/or annual leave balance, and that such time charged shall be restored to the extent of any Workers' Compensation Board reimbursement to the Department of Education; and

❖ The injured employee has the necessary accrued sick leave and/or annual leave balance or has been advanced credits in accordance with the applicable regulations, and

❖ The injured employee was not guilty of willful gross disobedience of safety rules or willful failure to use a safety device, or was not under the influence of alcohol or narcotics at the time of injury, or did not willfully intend to bring about injury or death upon him/herself or another; and

❖ The injured employee undergoes such medical examinations as are requested by the medical staff of the Department of Education and when found fit for duty by said physicians, returns to his/her employment.

Employees choosing *Procedure #1* above will be carried on full pay status and this time counted for retirement benefits.

**Procedure 2**    To receive Workers' Compensation benefits in their entirety with no charge against sick leave and/or annual leave balances.

Employees choosing *Procedure #2* who are Tier III/IV members of the retirement system will not receive retirement credit for the time during which they are receiving Workers' Compensation benefits. By law, such members may receive retirement credit only for service while being paid on the payroll.

The term Workers' Compensation benefits as used in this section refers to weekly payments in lieu of salary and not to payment of medical expenses.

**NOTE:** Any questions concerning Retirement Service Credit in connection with Worker's Compensation should be referred to the appropriate retirement system.



*SECTION 6*

# SECTION 7— OVERTIME AND MEAL ALLOWANCE

**7.1**   Overtime, outside of regular office hours as defined in Section 3 Working Hours, is not permitted without the prior written authorization of the Chancellor, Deputy Chancellor, Chief Executive, Executive Director, a Regional Superintendent, a Regional Operations Center Director, or authorized office head or designee. Anyone working overtime without such approval will not be paid for overtime work, except where required pursuant to the FLSA (Fair Labor Standards Act). [1]

**7.2**   No overtime credit will accrue for time taken for meals; all such time should be indicated on the time record and not credited as official business.

**7.3**   Eligible employees who work overtime in excess of the number of hours in their regular workweek but less than forty (40) hours are paid at their basic hourly rate for overtime.

Monetary payments shall be made at the rate of one and one-half times the employee's basic hourly rate for overtime worked in excess of forty (40) hours in the employee's regular workweek.

**7.4**   Eligible employees whose regular workweek is shortened under Section 3.1 will be compensated with cash payment for overtime worked in excess of the number of hours in the shortened workweek, up to the number of hours in the regular workweek.

**7.5**   No credit shall be recorded for unauthorized overtime.  Credit for all authorized overtime, beyond the normal work week, shall accrue in units of one-quarter (1/4) hour to the nearest one-quarter (1/4) hour and, except for an employee covered by the provisions of the Fair Labor Standards Act (FLSA), who has actually worked in excess of forty (40) hours in said calendar week, only after one (1) hour.[2]

**7.6**   No individual employee's overtime will be permitted to exceed 5% of the employee's current salary without the written authorization of the Chancellor, Deputy Chancellor, or designee.

**7.7**   Employees for whom cash payment for overtime is not permitted, and for whom the granting of compensatory time for overtime is permitted, will receive compensatory time on an hour for hour basis for overtime worked up to a forty (40) hour week and time and one-half for overtime worked in excess of a forty (40) hour week.

**7.8**   Compensatory time off shall be scheduled at the discretion of the office head. Compensatory time must be used within three (3) months of being earned unless a written request for approval to carry over such credit and  a plan for use of this time has been approved by the appropriate office head. [3]

---

[1] Compensatory time may not be utilized for represented employees unless explicitly provided for in a collective bargaining agreement. Division or office heads must obtain the consent of the non-represented employees covered by FLSA to accept compensatory time in lieu of cash payment for overtime worked in excess of forty (40) hours.

[2] For the period from July 15, 1996 to March 31, 2000 or July 15, 1996 to December 31, 1999, depending upon the expiration date of the applicable collective bargaining agreement:  Credit for all authorized overtime, beyond the normal work week, shall accrue in units of one-half (1/2) hour to the nearest one-half (1/2) hour and, except for an employee covered by the provisions of FLSA who has actually worked in excess of forty (40) hours in said calendar week, only after one (1) hour.

[3] Compensatory time earned under the Fair Labor Standards Act (FLSA) is not subject to the requirements that it be used within three (3) months of being earned.

# SECTION 7

**7.9**    Time in any workweek during which an employee is on full pay status, whether or not such time is actually worked, will be counted in computing overtime.

**7.10**    An employee who is required to work on any of the regular paid holidays specified in Section 3.3 will be paid a 50% cash premium for all hours worked on the holiday, and receive compensatory time off equivalent to the number of hours worked on the holiday.

**7.11**    Employees recalled from home for authorized ordered overtime work will be guaranteed overtime payment in cash for at least four (4) hours, if eligible for cash payment, with the exception of represented employees, wherein the overtime payment will be for at least two (2) hours for the period July 15, 1996 through March 31, 2000. This provision expires April 1, 2000. Therefore, effective April 1, 2000, the overtime payment will be for a minimum of four (4) hours (unless the applicable collective bargaining agreement provides for an effective date earlier than April 1, 2000.)

**7.12**    An employee who performs authorized overtime not compensated for by cash payment and who presents the required voucher to the office head will be reimbursed for meals in accordance with the appropriate schedule of maximum meal allowances in effect at such time. Time off for meals shall not be computed as overtime. However, such time off shall not affect the continuity requirement of any schedule.

When the Department of Education is officially closed early, supper money is not permitted for up to two (2) hours of additional work after the employee's regularly scheduled working hours. Employees must work for two (2) hours beyond their regularly scheduled working hours in order to receive payment for supper money.



*SECTION 7*

# SECTION 8— PROBATIONARY PERIOD

**8.1** Before being appointed from a Civil Service eligible list, an employee, in addition to being fingerprinted, must undergo a medical examination or review of medical documentation by the Medical Bureau of the Department of Education, if required, and, if found fit, shall serve a probationary period, in accordance with rules and regulations of the New York City Department of Citywide Administrative Services. The probationary period for administrative employees appointed from open-competitive and promotional civil service lists is one (1) year. The employee will be notified in writing, at the time of appointment, of the duration of the probationary period.

**8.2** The one (1) year probationary period is comprised of two parts: The first five (5) months in which the probationer's progress is assessed utilizing the Interim Probationary Report, and the last seven (7) months in which the probationer's performance is assessed in the Final Probationary Report, due at the conclusion of the first year of service.

*Interim Probationary Report.*
This report provides an initial assessment of the probationer's progress. Forms should be completed by the supervisor and signed by the probationer, the supervisor, and the organization head or authorized designee. A copy of the form is to be given to the employee and the original maintained in the employee's personnel file at the local level.

*Final Probationary Report.*

The Final Report shall indicate the recommendation of the managers and supervisors as to whether the services of the employee are to be retained or terminated. A copy of the form is to be given to the employee and the original maintained in the employee's personnel file at the local level.

**8.3** *Appointments from Promotion Lists*
Permanent employees, serving on a provisional basis in a promotional civil service title, and who have received a promotion from a civil service list, will have the probationary period reduced on a month for month basis up to the full year of the probationary period according to the length of time served as a provisional employee in that title.

**Appointments from Open Competitive Lists**

Prior service as a provisional employee cannot be counted towards the completion of the probationary period when such employee is hired from an open competitive list.

**8.4** The probationary period is automatically extended by the number of days that the probationer does not work. This includes:
- ❖ leaves without pay;
- ❖ leaves with pay;
- ❖ assignment to limited or light duty;
- ❖ educational leave.

The only exception to this rule is where an employee has been absent on military duty. If the employee is appointed or promoted while on military duty or enters military service prior to the completion of the probationary period, the probationary period is not extended.

*SECTION 8*

Should the office head be unable to make a definite decision as to retention of the employee on the basis of his/her services, a written request may be made to the Division of Human Resources, with the employee's written approval, for an extension of the probationary period, not to exceed six (6) months, in accordance with applicable Civil Service Law and regulations.

**8.5** The services of a probationary employee may be terminated at any time during the probationary period, in accordance with the provisions of Civil Service Law and regulations. If the office head decides that an employee's services should be terminated, a 9902 form and supporting documentation, including the Interim and Final Probationary Report must be submitted as soon as possible to the Division of Human Resources, Office of Certification and Appointments.

**8.6** Retention in service beyond expiration of the probationary period is equivalent to permanent employment. An employee who fails to satisfactorily complete the probationary period must be restored to a position in his/her permanent former title.



*SECTION 8*

# SECTION 9—CONDUCT AND DISCIPLINE

**9.1**      A high standard of courtesy, attention to duty and personal behavior is required of all employees of the Department of Education. Employees should not at any time conduct themselves in a manner to cause embarrassment to or criticism of the Department of Education, or interfere with efficient performance of their duties. Employees must, at all times, be courteous and avoid the use of brusque, impatient or violent language in their dealings with the public.

**9.2**      Boisterous, frivolous or ill-tempered language or acts, loitering or visiting in other parts of the building, waiting at the time clock prior to lunch and closing hours, punching the time clock for other employees, and leaving the building for personal reasons after registering the time of arrival, constitute violation of these rules and will subject the offender to disciplinary action.

**9.3**      No person employed by the Department of Education shall represent or presume to reflect the opinion of said board on any matter whatsoever before any legislative body or committee thereof, the Department of Education of the State of New York, or any other department or office of the State of New York, court, commission, person or group of persons without the express authorization of the Department of Education and then only to the extent provided in such authorization.

**9.4**      Employees are notified of matters of general importance by notices posted on the bulletin board. It is the responsibility of the office head or supervisor to post such notices promptly, and the responsibility of the employee to read such notices.

**9.5**      No employee should give or use information obtained by means of his/her official position to advance the interest of himself/herself, his/her family, or his/her business or personal associates over those of other persons.

**9.6**      *Lateness Policy*
**9.6.1**      *Determination of Lateness*
**9.6.1.1**      *General Definition of Lateness*
     Employees not at their work locations ready to work at the scheduled time are considered late. Each such occurrence, whether at the beginning of the scheduled workday or upon return from lunch or other scheduled non-work periods, constitutes lateness, with the exceptions described below:

**9.6.1.2**      *Grace Period*
     At the start of the workday, employees are allowed a grace period of five (5) minutes and, upon return from lunch, a grace period of three (3) minutes. If an employee arrives after the grace period has elapsed, he/she is considered late and lateness is determined from the scheduled reporting time; for example, an employee scheduled to begin work at 9:00 a.m., who reports to work at 9:06 a.m., is six (6) minutes late.

**9.6.1.3**      *Conditions where Latenesses are not Recorded*
     A late arrival is not recorded as lateness on the employee's attendance record under the following conditions:

     *Personal Business*

     If an employee arrives late due to the fact that personal business was conducted, he/she is not considered late provided that:

## SECTION 9

- ❖ The business could not have been conducted outside of regular working hours; and
- ❖ The employee obtained the prior approval of his/her supervisor for the late arrival.

The appropriate form, approved by the employee's supervisor should be submitted to the timekeeper. Time lost due to late arrivals will be deducted from compensatory time or annual leave balances on a straight-time basis.

Transit Delay

Employees may present certification of claimed transit delay forms for a lateness caused by a delay of fifteen (15) minutes or more. Excuse for lateness caused by transit delays will be limited to an occasional and/or extraordinary delay. Lateness caused by routine transit delays will not be excused. Employees experiencing transit difficulties on a routine basis must rearrange their schedules to allow extra time for travel.

The appropriate form, approved by the employee's supervisor should be submitted to the timekeeper.

Time lost due to approved transit delays will not be deducted from the employee's leave balances.

**9.6.2** *Penalties For Lateness*
The following penalties will be imposed for lateness in each three (3) month period of the vacation year: May 1 to July 31, August 1 to October 31, November 1 to January 31, and February 1 to April 30.

**9.6.2.1** *Deductions on Straight-Time Basis*
The occurrence of less than twenty (20) latenesses in any of above noted three (3) month periods will result in a deduction of the time lost from annual leave or compensatory time balances on a straight-time basis.

**9.6.2.2** *Deductions on Double-Time Basis*

The occurrence of twenty (20) latenesses or more in any of the above-noted three (3) month periods will result in a deduction of the time lost from annual leave or compensatory time balances on a double-time basis.

**9.6.3** *Excessive Lateness*
Excessive lateness is defined as more than sixty (60) latenesses in the vacation year (May 1 to April 30 of the following year). In the case of excessive lateness, the employee's supervisor may recommend that disciplinary action be taken under Section 75 of the New York State Civil Service Law. This action may result in a reprimand, fine, suspension, demotion, or dismissal.

**9.6.4** *Action by Timekeepers*
**9.6.4.1** *Monthly Review of Time Reports*
At the end of each month, the timekeeper will review the employee's monthly time report to determine the number of latenesses that occurred in the month and the corresponding amount of time lost. Appropriate entries will be made on the employee's attendance record in the sections designated for lateness. The time lost will be deducted from compensatory time or annual leave balances on a straight-time basis or on a double-time basis depending on circumstances *(See Section 9.6.2.2)*

## SECTION 9

### 9.6.4.2 Quarterly Review of the Attendance Record

At the end of each three (3) month period of the vacation year, the timekeeper will take the following actions:

❖ Determination of Double-Time Deductions
The employee's attendance record will be reviewed to determine the total number of latenesses that occurred in the three (3) month period. If twenty (20) latenesses or more occurred, the penalty described in 9.6.2.2, deduction of the total time lost due to lateness on a double-time basis, will be imposed: i.e. a second deduction of the time lost will be made.

❖ Notification of Lateness to the Employee and Supervisor
A letter in which the number of latenesses that occurred in the three (3) month period, and the corresponding amount of time lost indicated will be sent to the employee and the employee's supervisor.

### 9.6.4.3 Deductions of Time Lost From Leave Balances

Time lost due to lateness will be deducted from the available compensatory time balance first. After the compensatory time balance has been exhausted, the annual leave balance will be charged.

If the time lost exceeds the available compensatory time and annual leave balances, a payroll deduction for the amount of time in excess of the available balance will be processed.

### 9.6.5 Role of Supervisors

Upon receipt of the letter of notification described in Section 9.6.4.2, the supervisor will hold a conference with the employee for the purpose of examining the employee's lateness record, reviewing the lateness policy, determining the reasons for tardiness, and discussing methods to effect improvement in punctuality. Such methods as adjustment of the daily time schedule, if appropriate, may be considered.

The supervisor will record the results of the discussion in a written communication to the employee, and ask the employee to acknowledge receipt of the communication by affixing his/her signature. Copies of the signed communication will be placed in the employee's file located in his/her office and the file located in the timekeeping office.

### 9.6.6 Inquiries

Employees should direct inquiries relevant to the interpretation or application of the lateness policy to their timekeepers.

**9.7** The property of the Department of Education entrusted to the care of employees must be kept in good order. Breakage, loss, or impairment must be reported in writing immediately to the office head with an explanation of the cause. Papers, books, etc. should be put in their proper places.

**9.8** Office equipment, e.g. fax machines, computers, etc. are to be used for official purposes only. Stationery and other supplies must also be used for official purposes only, and should not be wasted.

**9.9** Telephones shall be used for official purposes only, except in the event of emergencies where specific permission has been obtained from the office head.

## SECTION 9

**9.10** Any member of the administrative staff of Central Headquarters or a community school district who has a change of name while in the service should report such fact immediately to the office head, or designated authority, or Community Superintendent, or the person designated by the Community Superintendent, who will report such fact to the Division of Human Resources.

**9.11** A member of the Board of Education Retirement System must submit to medical examination by the Medical Board when requested to do so, pursuant to an application for his/her disability retirement made to the Department of Education.

**9.12** No employee of the Department of Education shall accept any commission, royalty or other consideration, except his/her regular salary, for any service performed or sale effected, or for any article, invention or material used in erecting, furnishing, or supplying any school building or department, or any labor performed under the jurisdiction of the Department. This rule shall not apply to authors of books used in public schools with respect to royalties on the sale of such books.

**9.13** Absence of an employee from duty except for satisfactory cause shall be deemed neglect of duty.

**9.14** Failure of an employee who is absent to notify his/her supervisor promptly, stating the cause and probable duration of his/her absence and giving his/her exact location, in accordance with Sections 5.8, 5.9, and 5.10 may result in the office head's recommendation that the time elapsing before notification be without pay. This shall not apply when the office head is satisfied by incontrovertible evidence that it was physically impossible for the employee to give the required notification.

**9.15** Failure to comply with Section 5.18, whereby employees on sick leave for recovery of health, treatment of illness, or other purposes may not go to places remote from their residences, without the approval of the Chancellor, shall be deemed insubordination.

**9.16** Recording the time of another employee will be considered gross misconduct and will form the basis for disciplinary action, which may include the preferral of charges against the offending employee.

**9.17** No employee who has served his/her probationary period will be removed, except for cause, after a hearing. Any such employee may be suspended by the Chancellor in accordance with Civil Service law and collective bargaining agreements.

**9.18** *Charges*
Charges may be preferred against any employee for:

> ❖ **unauthorized absence from duty or, excessive absence/lateness;**
> ❖ **neglect of duty;**
> ❖ **conduct unbecoming his/her position, or conduct prejudicial to the good order, efficiency, or discipline of the Department of Education**
> ❖ **incompetent or inefficient service to the Department of Education;**
> ❖ **violation of the Bylaws, rules or regulations of the Department of Education;**
> ❖ **any substantial cause that renders the employee unfit to perform properly his/her obligations to the Department of Education**

*SECTION 9*

**9.19** An employee against whom charges have been preferred will be provided with a copy of the charges and specifications. Such employees may participate in person, by counsel or representative, in the trial of charges, to call and examine witnesses in his/her own behalf and to cross-examine opposing witnesses.

**9.20** The Chancellor, upon suspending any employee, and in advance of the filing of charges and specifications, will inform the accused of the character of the charges to be met. Such information shall not prevent inclusion at the trial of additional charges and specifications, provided the accused is informed prior to the trial.

**9.21** If, after due and timely service as defined in the Bylaws of the Board of Education or by the Chancellor's Regulations, the employee against whom the charges have been preferred fails to appear at the time and place set for trial, either in person or by counsel, the trial of the said charges will proceed and be determined in the same manner as though the accused were in personal attendance or represented by counsel, and the finding and judgment of the Department of Education will be final.

**9.22** The Department of Education may designate a trial committee or trial examiner to try the charges. The report of any trial committee or trial examiner is subject to final action by the Department.

**9.23** ***Equal Opportunity***

It is the policy of the Department of Education of the City of New York to provide educational and employment opportunities without regard to race, color, religion, creed, ethnicity/national origin, alienage and citizenship status, age, marital status, disability, sexual orientation, gender (sex), including sexual harassment, prior record of arrest and convictions, and to maintain an environment free of harassment or retaliation. This policy is in accordance with federal, state and local EEO laws. Any person who believes he or she has been discriminated against should contact their Local Equal Opportunity Coordinator (LEOC) or the NYC Department of Education Office of Equal Opportunity (OEO).

**9.24** ***Sexual Harassment***

Sexual harassment is prohibited by the Department of Education and is a violation of federal, state, and local law. Sexual harassment is defined as any unwanted and/or repeated verbal or physical advances, sexually explicit derogatory statements, or sexually discriminatory remarks made by someone in the workplace or educational setting which is offensive or objectionable to the recipient or which causes the recipient discomfort or humiliation or which interferes with employment or educational activities. Any person who believes he or she has been sexually harassed should contact his/her Local Equal Opportunity Coordinator (LEOC) or the NYC Department of Education Office of Equal Opportunity (OEO).

**9.25** ***Reasonable Accommodation Due to Disability***

An employee who has a physical or mental disability that substantially limits a major life activity, as defined by the Americans with Disabilities Act (ADA), can request a reasonable accommodation to assist in performing the essential functions of his/her job. The employee should complete and submit Personnel Memorandum #51 together with medical documentation to the Medical Bureau requesting the accommodation. Personnel Memorandum #51 can be obtained from the employee's Human Resources office or from the Medical Bureau.



**SECTION 9**

# SECTION 10 — INJURIES IN THE LINE OF DUTY

**10.1** When an employee is injured in the course of employment, the first aid care of the injured takes precedence over all other requirements. An employee who is injured in the course of employment must report such injury as promptly as possible to his/her immediate supervisor.  If the employee is unable to contact the immediate supervisor, the employee must report the accident and the injury as promptly as possible to the office head or an authorized representative.
**NOTE:** With respect to employees covered by the Workers' Compensation Law, compliance with the provisions of the law concerning written notice to the employer is also required.

**10.2** If a staff physician does not call upon the injured employee, one of the following actions must be taken within five (5) business days:

**10.2.1** The office head or his/her authorized representative may arrange for the injured employee to report to the Medical Bureau for a medical examination, or

**10.2.2** If the employee is unable to report to the Medical Bureau because of his/her physical condition, the employee must submit to his/her office head a physician's certificate, satisfactory to the Medical Bureau in form and content, or

**10.2.3** The employee should submit to the office head a letter indicating that there has been no need for medical care.

**10.3** Reimbursement of time lost due to an injury in the line of duty will be governed by Section 6.12.

**10.4** The following benefit payments will be made in the event of an employee's death as the result of an injury in the line of duty:

**10.4.1** All unused accrued annual leave to a maximum of fifty-four (54) days credit.

**10.4.2** All unused accrued compensatory time earned subsequent to July 1, 1968 and retained pursuant to these regulations, certifiable by official Department records, to a maximum of two hundred (200) hours.

**10.4.3** If an employee dies because of an injury in the line of duty through no fault of the employee, and in the proper performance of duties, payment of $25,000 will be made to the employee's beneficiary or estate in addition to any other payment due.

The estate, spouse or child of the employee should contact the Division of Human Resources in order to obtain payment.  Should the estate, spouse or child of the employee fail to contact the Division of Human Resources, the Division of Human Resources will be responsible for contacting the appropriate party.

**NOTE**: Payments described in Section 10.4.1 and 10.4.2 above will also be made in the event of the death of an employee not due to a line of duty injury.



# SECTION 11— SALARIES

The salaries of employees covered by a collective bargaining agreement or a specific pay plan shall be governed by the rates set forth therein. Employees for whom there is not a specific compensation rate shall have their salaries set by the Department of Education.



# SECTION 12—INTEROFFICE TRANSFERS

**12.1**  Employees have the privilege of seeking transfer from one office to another. The normal procedure for such transfer is for the employee, through proper supervisory channels, to seek the approval of his/her office head and the office head to which transfer is sought. An employee who has obtained the approval of his/her office head may request the Division of Human Resources to assist him/her in locating another position.

Time taken by the employee to locate a position may be taken at the convenience, and with the approval of the head of the office in which employed. If the amount of time so taken is excessive, an office head may require that the time taken be treated as absence on personal business, and charged to the employee's annual leave allowance.

**12.2**  Where preliminary negotiations result in an employee's failure to obtain the approval of his/her office head for his/her release, the employee may address a communication to the office head who, within a two (2) week period of receipt of the communication, will forward it to the Division of Human Resources with the reasons for his/her denial. The office head will, at the same time, provide the employee with a copy of the transmittal letter. The employee may then, within a two (2) week period from receipt of his/her copy of said transmittal, submit a written statement to or ask to be heard before the Chief Executive (or designee), Division of Human Resources.  The Chief Executive of the Division of Human Resources (or designee) will take all other action as necessary to provide fair consideration of the application and will submit an advisory opinion to the office head and employee.



# SECTION 13—APPEALS

Administrative employees who claim that their rights have been violated as a result of an interpretation, or a denial of any of these Rules and Regulations, may appeal to the appropriate advisory body through the Division of Human Resources, Office of Support Services, 65 Court Street-Room 504, Brooklyn, New York  for final determination.



# SECTION 14—BYLAWS

The *Rules and Regulations for Administrative Employees* incorporate, as a matter of reference and interpretation, the articles set forth in the New York City Department of Education Bylaws.

